828 So.2d 83 (2002)
Dudley PILLOW, Plaintiff-Appellee,
v.
ENTERGY CORPORATION, Defendant-Appellant.
No. 36,384-CA.
Court of Appeal of Louisiana, Second Circuit.
September 18, 2002.
Writ Denied December 13, 2002.
*85 Michael Lee Dubos, Alicia R. Reitzell, for Defendant-Appellant.
Leroy Smith, Jr., for Plaintiff-Appellee.
Before STEWART, GASKINS and HARRISON (Pro Tempore), JJ.
HARRISON, Judge Pro Tempore.
Plaintiff filed suit for damages against a rural electric power company after his horse was electrocuted by a guy line supporting an electrical pole. The trial court found that the power company was at fault for the accident and imposed liability. Defendant appeals alleging errors of law and fact. Finding neither, we affirm.

Facts
Dudley Pillow, a resident of Yazoo City, Mississippi, owns Willow Glen Plantation in Madison Parish where he raises horses. Pillow had a contract to sell a particular quarter horse named Shane's Miss Duchess for $35,000 to a Mr. James Kifer.[1] The horse was pregnant, and under the terms of the sale, Pillow would retain ownership of the foal.
On June 19, 2000, the horse was in the area of a guy line[2] attached to an electrical pole that had once provided electrical service to the homesite of Pillow's mother. This was not unusual, as horses have grazed in that area on the property for over 40 years. The house had been abandoned for 25 years, but Entergy continued to provide power to the service pole in order to preserve its servitude.
Although the pole was located outside the fenced property, a guy line was anchored within the fence north of the pole and supported the pole against the southerly pull of the power transmission lines. Vestiges of a second guy line can be seen on the pole, which was anchored where a shed is now located. This guy line once supported the pole against the westerly pull of the lines. Its absence had caused the pole to lean 10 to 15 degrees to the west. An Entergy employee who worked rural electrical lines testified that rural customers often remove guy lines when they get in the way of their farming operations. Pillow and his employees denied ever removing the second guy line, and no one could remember ever having seen the guy line in his lifetime.
Photographs of the extant guy wire revealed an area of dark brown discoloration on the taut guy line at a height matching the height of a horse. The plaintiff testified that horses have rubbed and scratched against the wire for some time. Apparently while she was rubbing against the wire for that purpose, one of the hind legs of Shane's Miss Duchess became entangled in the wire "like the stripe on a candycane." One witness to the scene theorized that the horse kicked her hind leg for some unknown reason while she brushed against the wire. The kick caused her hoof to swing around the back of the wire and get *86 stuck. The terrified horse panicked and began thrashing about causing the electric pole to rock. This, in turn, caused the energized and neutral lines between the poles to "gallop" or swing vertically and make contact with one another.
It is common practice in the industry to attach the neutral line to the guy line for grounding purposes. Hence, each time the hot or energized line made contact with the neutral line, it sent an electrical charge down the guy line that shocked the horse causing her to jump and kick again. After about an hour of repeated electrical jolts, the horse died.
Pillow filed suit against Entergy alleging that Entergy negligently allowed the guy wire to become energized, failed to protect animals from the guy wire, and failed to properly maintain the line.
Entergy denied any fault or negligence in its answer, and alternatively, it alleged that if it should be found at fault, plaintiff was comparatively at fault.
At trial, plaintiff's expert, Mr. William Adams, opined that a second guy wire would have made the accident less likely. He also testified that there was too much sag in the lines. He believed that if there were less sag, and an additional guy wire, the accident would probably not have occurred. However, he admitted that guy lines were not designed to protect against humans or animals trying to shake the pole, but to provide support for the pole against the draw of the transmission lines. He also stated that the latest inspection tag he saw on the pole was dated in 1972.
Defendant's expert, Mr. Frederick Brooks, testified that the transmission lines were in conformity with National Electric Safety Code ("NESC"). He stated that there is no maximum sag guideline in the NESC, although there is a minimum sag. The only requirement is that the lines maintain a minimum clearance of 18.5 feet. According to Mr. Brooks, the lines in question had a clearance of over 20 feet. He also believed that the additional east-west guy wire would have had no effect in preventing the galloping of the north-south transmission lines when the horse put pressure on the guy line. Mr. Brooks said all of the poles in the line had inspection tags dated "1994."
After a bench trial, the court ruled in favor of the plaintiff, finding that the original plans called for a second guy wire, and concluded that "whatever the reason that those wires were swaying," it was the fault of Entergy. It awarded damages of $35,000 for the horse based upon the contract sale price, and it awarded $35,000 damages for the unborn foal based upon plaintiff's testimony that he expected the foal to be at least as good as the mare.
Entergy appeals complaining that the trial court erred when it concluded that it breached a duty to plaintiff to supply a second or east-west guy wire. It further argues that the court erred in finding that a lack of the east-west guy wire was a cause of the accident. Finally it contends that the risk that a horse would become entangled in the guy wire was not foreseeable and therefore, the duty to supply an east-west guy wire did not encompass the risk that a horse would become entangled in the guy wire, panic and cause the guy wire to become energized.

Discussion
In cases of injury or electrocution occurring as the result of contact with overhead power lines, negligence principles of tort liability involving assessment of liability of various parties to the accident under a duty-risk analysis apply, rather than principles of absolute or strict liability. Thibodeaux v. Central Louisiana Elec. Co., 428 So.2d 1269 (La.App. 3d Cir.), writ denied 433 So.2d 1050 (1983).
*87 Duty-risk is the appropriate analysis in an action brought against an electric utility company for negligence. Fleniken v. Entergy Corp., 00-1824 (La.App. 1st Cir. 2/01/01), 780 So.2d 1175, writ denied 01-1268 (La.6/15/01), 793 So.2d 1250, writ denied 01-1305 (La.6/15/01), 793 So.2d 1253, writ denied 01-1317 (La.6/15/01), 793 So.2d 1254.
Electric transmission companies which maintain and employ high power lines are required to exercise the utmost care to reduce hazards to life as far as to insulate them, or to give adequate warning of the danger, or to take other proper and reasonable practical steps. If it should be reasonably anticipated that persons may come into contact with electric lines, the operator of those lines is required to take precautions to prevent injury. Simon v. Southwest Louisiana Elec. Membership Corp., 390 So.2d 1265 (La.1980). However, an electric utility is not required to guard against situations which cannot reasonably be expected or contemplated. Hebert v. Gulf States Utilities, 426 So.2d 111 (La. 1983); Fleniken v. Entergy Corp., supra; Dixon v. Northeast Louisiana Power Co-op, Inc., 524 So.2d 35 (La.App. 2d Cir. 1988), writ denied 526 So.2d 809 (La.1988). A power company is held to the standard of a reasonable person with superior attributes, and is required to realize that there will be a certain amount of negligence that must be anticipated. Green v. Claiborne Elec. Co-op., Inc., 28,408 (La. App.2d Cir.6/26/96), 677 So.2d 635.
Accordingly, a power company has an obligation to make reasonable inspections of wires and other instrumentalities in order to discover and remedy hazards and defects; consequently, a company will be considered to have constructive knowledge of an electrical hazard which has existed for a period of time which would reasonably permit discovery had the company adequately performed its duties. In re New Orleans Train Car Leakage Fire Litigation, 00-0479 (La.App. 4th Cir.6/27/01), 795 So.2d 364. This duty includes the duty to inspect its lines to determine if uninsulated high voltage lines pose a risk of harm, and if the utility relies on insulation by isolation,[3] it has a duty to make certain the lines remained isolated. Fleniken v. Entergy Corp. supra.
Thus in order to establish the liability of Entergy in this case, plaintiff had to prove that (1) Entergy owed a duty to Mr. Pillow; (2) that Entergy breached that duty; (3) that Entergy's conduct was a cause-in-fact of the injury; (4) that Entergy's conduct was the legal cause of the injury; and (5) Mr. Pillow suffered damages. The first element is generally a question of law for the judge, whereas the remaining questions are generally for the factfinder. Fleniken, supra.
Entergy maintains that it was under no duty to install a second guy line, which it contends the trial court found would have prevented the accident. Next, while acknowledging its duty to maintain its facilities in a reasonably safe condition, Entergy contends that this duty did not encompass the risk that a horse would become entangled in the north-south guy line and would electrocute itself trying to get free. Finally, Entergy contends that the absence of an east-west guy wire did not cause the accident, nor would its presence have prevented it. We will first consider Entergy's argument that the trial court found that Entergy owed Mr. Pillow a duty to install an east-west guy line and the breach of this duty was the cause in fact of the accident.
*88 Shane's Miss Duchess was electrocuted because it was able to rock the electric pole to such an extent that it caused the neutral and primary electrical lines or "conductors," which were insulated by isolation, to make contact with one another and thereby energize the guy line, which is connected to the neutral line as a ground. Much of the trial testimony centered over whether a second guy line would have made a difference. Entergy's expert, Mr. Frederick Brooks, submits that the purpose of the second guy line was to support the pole against the pull of the east-west line, and its absence for an estimated 40 years was proof that it was not needed. Entergy contends that even if the guy wire were in place, it would not have prevented the horse from shaking the pole. Plaintiff's expert, Mr. William Adams, believed that the additional guy wire and less sag in the lines would have probably prevented the accident.
Contrary to Entergy's position, the court did not find that Entergy owed Mr. Pillow a duty to install a second guy line and impose liability for the breach of this duty. Although the court noted in its oral reasons for judgment that the original construction called for two guy wires and it obviously believed that this was a factor in the accident, it went on to say that, "whatever the reason that those wires were swayingit appears to the court that it was the fault of Entergy and therefore, Entergy is liable for the damages that occurred." The swaying of the wires caused the lines to make contact and allowed electricity to escape into the guy line. The trial court noted that "a high burden is placed on the utility company to see that its lines are properly maintained." This duty includes the duty to inspect its lines to determine if uninsulated high voltage lines pose a risk of harm, and if the utility relies on insulation by isolation, it has a duty to make certain the lines remained isolated. Fleniken, supra. Hence, the duty owed by Entergy to Mr. Pillow was to prevent its electricity from escaping the conductors that were insulated by isolation and traveling down the guy wire where Mr. Pillow's horses grazed.
Entergy next argues that its duty to maintain the facilities in a reasonably safe condition did not encompass the risk that a horse would become entangled in the guy line and set forth the subsequent chain of events. When the accident in question could not have been reasonably anticipated, it is not within the scope of the duty owed by the utility company to the injured party because there is no ease of association between the risk presented by the utility company's conduct under the overall circumstances and the resulting injury. Fleniken v. Entergy Corp., supra.[4]
We are also mindful, however, that while the question of "whether a duty is owed by one party to another is a legal *89 question," "[t]here is no `rule' for determining the scope of the duty." Roberts v. Benoit, 605 So.2d 1032, 1044 (La.1991). The scope-of-duty inquiry is fact sensitive and ultimately turns on "a question of policy as to whether the particular risk falls within the scope of the duty." Id.
The jurisprudence has established two levels of the duty of care owed by power companies. See Perkins v. Entergy Corp., 98-2081(La.App. 1st Cir.12/28/99), 756 So.2d 388, aff'd 00-1372 (La.3/23/01), 782 So.2d 606. When the risk involves electrocution, the duty is of utmost care; in cases which involve accidents other than electrocution, that occur on the property of a customer and are allegedly caused by some action or inaction on the part of the electric utility company, the utility company's duty is to use reasonable care in the installation, operation, and maintenance of their electric lines. Id. A company which maintains and employs high power lines is required to exercise the utmost care to reduce hazards to life as far as practicable. Levi v. Southwest Elec. Membership Cooperative, 542 So.2d 1081 (La.1989); Simon v. Southwest Louisiana Elec. Membership Corp., supra. Pursuant to this duty, a power company has an obligation to make reasonable inspections of wires and other instrumentalities in order to discover and remedy hazards and defects. Id.; Spillars v. Louisiana Power and Light Co., 49 So.2d 474 (La.App. 2d Cir.1951); Scott v. Claiborne Elec. Co-op., 13 So.2d 524 (La.App. 2d Cir.1943). Consequently, a company will be considered to have constructive knowledge of an electrical hazard which has existed for a period of time which would reasonably permit discovery had the company adequately performed its duties. Levi, supra; Potts v. Shreveport Belt Ry. Co., 110 La. 1, 34 So. 103 (1903); Bourgoyne v. Louisiana Public Utilities Co., 150 So. 68 (La.App. 1st Cir.1933); Carlock v. Westchester Lighting Co., 268 N.Y. 345, 197 N.E. 306 (1935); Roberts v. Pacific Gas & Elec. Co., 102 Cal.App. 422, 283 P. 353 (1929).
What is apparent in this case from the visible condition of the pole is that Entergy did not inspect or maintain the pole with reasonable frequency. Without the second guy line, the pole was bent and leaned noticeably to the west 10 to 15 degrees, and, in recent years, it had been overgrown with vines. The last time the pole was inspected was in 1994, some six years prior to the accident. A careful inspection would have revealed that the guy line itself was very discolored at the height of a horse's body from repeated use of the wire as a scratching post. As noted, the plaintiff testified that it was not unusual for an animal to rub against a wire. Testimony elicited at trial by defendant's counsel stressed that a 1300 pound horse could easily rock the pole. Indeed, Mr. Adams, plaintiff's expert, agreed with defendant's counsel that even two or three men could exert pressure on the guy wire enough to cause the pole and lines to sway.
Mr. Adams also testified that he thought that there was too much sag in the lines which enabled the lines to make contact. Defendant's expert testified that there is no maximum sag under the NESC, and that the lines in question were above the minimum 18.5 feet. However, "mere compliance with safety standards does not, per se, relieve the utility of negligence." Fleniken, supra, citing Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983). We conclude, therefore, that under the circumstances of this case, it was reasonably foreseeable that the horse could exert enough force on the guy line to rock the pole and cause the isolated lines to come into contact, thereby electrocuting the horse. Entergy breached its duty to discover *90 the risk posed by the horse and the unprotected guy line and to make certain that its lines that were insulated by isolation remained isolated.
Finally, Entergy argues that the trial court erred in concluding that the absence of a second guy line was the cause of this accident. As we have shown above, this argument is without merit, being based upon the faulty premise that the court concluded that the failure to install the second guy line was the sole cause of the accident. We disagree with Entergy's interpretation of the trial court's oral reasons as to the cause of the accident. The court clearly stated that it found that the original construction called for a second guy line. It did not conclude, however, that the absence of the second guy line was the cause-in-fact of the accident.

Conclusion
For these reasons, we conclude that the trial court did not err in imposing liability on Entergy. Accordingly, the judgment of the trial court is affirmed at appellant's cost.
AFFIRMED.
NOTES
[1] La. Civil Code Article 2467 provides that the risk of loss of a thing sold due to a fortuitous event is not transferred to the buyer until the time of delivery.
[2] For an extensive discussion of the purpose of guy wires for telephone and electrical poles, see 8 ALR 5th 191. For an extensive annotation of cases dealing with the electrification of guy lines, see 55 ALR 2d 129 and supplement. For an extensive annotation of cases dealing with collisions with guy lines, see 8 ALR 5th 177.
[3] The lines in this case were insulated by isolation, that is, they were allegedly out of reach of human beings.
[4] In Fleniken, supra, a trucker was injured when he came into contact with an electrical line while he was standing on top of a tractor trailer conducting a pre-trip inspection at a truck terminal. The court imposed liability holding that the power company had a duty to inspect its lines to determine that uninsulated high voltage lines did not pose risk of harm, and if the company relied on insulation by isolation, it had a duty to make certain the lines remained isolated. The court stated that the latter duty is "heightened" where there was activity and the area was no longer isolated and no longer uninhabited.

The situation in the instant case is arguably distinguishable from the situation in Fleniken regarding the heightened duty to inspect power lines in busy or populated areas. There is not a heightened duty to inspect in this instance where the scene of the accident is largely rural and unpopulated. On the other hand, because Entergy relied on insulation by isolation, it still had a duty to exercise reasonable care in making certain the lines remained isolated.