925 So.2d 638 (2006)
Jeremy Dean FOLEY and Joy Dawn Foley, Individually and on Behalf of Their Minor Children, Nikolas Foley and Dylan Foley
v.
ENTERGY LOUISIANA, INC., Feliciana, a Louisiana Partnership in Commendam and Latter & Blum, Inc.
No. 2004-CA-1967.
Court of Appeal of Louisiana, Fourth Circuit.
February 15, 2006.
Rehearing Denied March 30, 2006.
*639 William P. Connick, Connick and Connick, L.L.C., Patrick G. Kehoe, Jr., New Orleans, Counsel for Plaintiffs/Appellants.
*640 Kenneth P. Carter, Louis Leonard Galvis, Catharine Ohlsson Gracia, Hammond, Margaret Jenkins Savoye, Baton Rouge, Counsel for Defendant/Appellant, Entergy Louisiana Inc.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge JAMES F. McKAY III, Judge DAVID S. GORBATY, Judge EDWIN A. LOMBARD, and Judge ROLAND L. BELSOME).
JAMES F. McKAY III, Judge.
On November 12, 1998, Jeremy Foley was working as a roofer for Robertson Roofing and Siding, Inc. (Robertson Roofing) making roofing repairs on Building D at the Feliciana Apartments in Harvey, Louisiana when he and his co-worker, Jason Rodriguez, raised a twenty foot aluminum ladder into an uninsulated overhead power line owned and operated by Entergy Louisiana, Inc. (Entergy) causing substantial injury by electrocution to Jeremy Foley. At the time of the accident, Jeremy Foley was twenty-four years old and was married to Joy Foley and was the father of two young children.
The power line, which ran in front of Building D was part of an Entergy single phase line system that consisted of two separate wires: a neutral "shield" line that did not carry an electrical current and a live "phase" line that carried 8,000 volts of electricity. Entergy's sole method of insulating its live power lines at the complex of three story buildings was "insulation by isolation", which consisted of stringing the lines at a vertical height that it believed was out of reach. There were no warning signs or instrumentalities such as orange foam balls on or in the vicinity of the lines. At the site of the accident, the neutral shield line was strung directly above the live phase line with a distance of approximately three feet separating the lines. At 16 of the 23 identical apartment buildings in the Feliciana/Alouette complex, the neutral shield line was instead placed directly under the live phase line. At 7 of the 23 buildings, including Building D, the neutral shield was placed directly above the live phase line. Approximately twelve years before Jeremy Foley's accident, two painters, Carl and Craig Davis, were electrocuted when they raised their ladder in front of Building D just a few feet from where Jeremy Foley and Jason Rodriguez raised their ladder.
Jeremy Foley and Joy Foley, individually and on behalf of their minor children, Nikolas Foley and Dylan Foley, brought a suit for damages against Entergy, Latter & Blum Property Management, Inc. (Latter & Blum), the manager of the property, and WFMFT Real Estate Limited Partnership (WFMFT), the owner of the property. Prior to trial, Latter & Blum and WFMFT were dismissed from the case on summary judgment. A bench trial took place on January 12-16 and May 3, 2004. At the commencement of the proceedings, the trial court ruled that it would not consider any evidence Entergy wished to introduce as to the fault of co-defendants, Latter & Blum and WFMFT. The trial court found that Jeremy Foley was 20% at fault for the accident, Jason Rodriguez was 5% at fault, Robertson Roofing was 40% at fault, and Entergy was 35% at fault. Based on these findings, the trial court rendered judgment in favor of the plaintiffs and against Entergy, awarding Jeremy Foley $4,735,297.70; $105,000.00 to Joy Foley; and $70,000.00 to each of the minor children. In addition, Robertson Roofing was awarded $575,673.87 on its intervention claim. Both Entergy and Jeremy Foley appeal the trial court's judgment.
On appeal, Entergy contends that the trial court erred in finding that it was *641 negligent in any manner that caused or contributed to the plaintiffs' damages and the trial court erred and abused its discretion in denying Entergy the right to introduce at the trial of this matter evidence of the fault of Latter & Blum and WFMFT. The plaintiffs contend that the trial court erred in its determination of the percentages of fault of the various parties and actors involved.
An appellate court's review of a trial court's findings is governed by the manifest error (clearly erroneous) standard. Stobart v. State of La. Through DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there is conflict in testimony, reasonable inferences of fact should not be disturbed on review even if the appellate court may feel that its own evaluations and inferences are just as reasonable. If the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if it is convinced that it would have weighed the evidence differently if it had been sitting as the trier of fact. Id.
As with other factual determinations, a trier of fact is vested with much discretion in its allocation of fault. Thonn v. Cook, XXXX-XXXX (La.App. 4 Cir. 12/10/03), 863 So.2d 628. Therefore, an appeals court should only disturb the trier of fact's allocation of fault when it is manifestly erroneous.
In the instant case, Entergy specifically pled the fault of third parties as a cause of the plaintiff's accident and injuries as an affirmative defense in its answer to plaintiffs' petition for damages. Pursuant to Louisiana Civil Code Article 2323 and the Louisiana Supreme Court's holdings in Keith v. United States Fidelity & Guaranty Co., 96-2075 (La.5/9/97), 694 So.2d 180, 182-84 and Dumas v. State ex rel. Dept. of Culture, Recreation & Tourism, XXXX-XXXX (La.10/15/02), 828 So.2d 530, Entergy was entitled to present evidence of the negligence and fault of third parties at the trial of this matter. The trial court denied Entergy that right on the grounds that the parties against whom Entergy wanted to offer such evidence had been dismissed on summary judgment as statutory employers of Jeremy Foley. However, a party's status as a plaintiff's employer, immune from any claim by the plaintiff for damages, cannot prohibit a defendant from introducing evidence as to the employer's fault for the accident and injuries sustained by the plaintiff. Thus, there is no basis for excluding such evidence offered against a party who is the plaintiff's statutory employer. On the contrary, Article 2323 requires that the fault of every person responsible for plaintiff's injuries be compared, whether or nor such person is a party, and regardless of the legal theory of liability asserted against such person. The trial court erred in depriving Entergy the opportunity to present such evidence. As such we reverse this ruling.
We have examined the evidence proffered by Entergy regarding the fault of third parties. Harry Jackson, the maintenance supervisor at the Feliciana Apartments, testified that he did not warn the roofers about the wire at Building D, or that a prior accident had occurred. Andrew Lawyer, who performed an accident reconstruction, opined that the management or employees of the Feliciana Apartments should have pointed out the wires to the roofers, and advised them of the prior accident. Although we have found that the trial court erred in not allowing Entergy the opportunity to present evidence of third party fault, based on the proffered evidence, we conclude that Latter & Blum and WFMFT were not at fault in this *642 accident in any way. As such, we assign no percentage of fault to these parties.
In determining percentages of fault, various factors should be considered, including: (1) whether the conduct resulted from inadvertence or an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Cas., Ins. Co., 469 So.2d 967 (La.1985). In the instant case, Entergy was clearly aware of the danger; an electrocution had taken place at the same location some twelve years earlier. See Davis v. Louisiana Power & Light Co., 612 So.2d 235 (La.App. 4 Cir.1993). In its reasons for judgment, the trial court recognized that "Entergy did little if anything to take any corrective action during the 12 year interim between the two accidents such as adequately inspect its lines, raise its lines, adjust the final sag in the line and/or invert the neutral shield line with the live phase line so that the former would provide an additional buffer of safety that would have eliminated this catastrophic accident." Entergy was also the superior actor under the facts and circumstances of this case. This likewise was recognized by the trial court when it pointed out that the facts and circumstances of Dobson v. LP & L, 567 So.2d 569 (La.1990) bear a notable resemblance to the present matter.[1] In that case, the Supreme Court held that a live power line is one of the most dangerous things known to man. Id. at 572. The Supreme Court further noted that "[n]ot only is the current deadly, but the danger is hidden away in an innocent looking wire ready at all times to kill or injure anyone who touches it or comes near to it. For the average citizen, there is no way of knowing whether the wire is harmless or lethal until it is too late to do anything about it." Id. at 572 citing Godesky v. Provo City, Corp., 690 P.2d 541, 548 (Utah 1984) quoting Brigham v. Moon Lake Electric Assoc., 24 Utah 2d 292, 470 P.2d 393, 395 (1970).
In spite of all this, the trial court only apportioned 35% of the fault in this matter to Entergy with 40% apportioned to Robertson Roofing, 20% to the plaintiff and 5% to Jason Rodriguez. In our view, this is clearly wrong. Because high power lines are inherently dangerous, utility companies that maintain and employ high voltage electric power lines are required to exercise the "utmost care" to reduce hazards to life as far as to properly insulate them, or give adequate warnings of the danger, or to take other proper and reasonable practical steps. Pillow v. Entergy Corp., 36,384 (La.App. 2 Cir. 9/18/02), 828 So.2d 83, 87. Considering the facts of this case, with particular attention to the history of the site and the capacities of the various actors, 50% of the fault should be apportioned to Entergy and the fault allocated to the plaintiff should be reduced to 5%. We find no error in the trial court's allocation of fault to Robertson Roofing or Jason Rodriguez. As such, Entergy should pay the following sums to the plaintiffs: $6,414,711.00 to Jeremy Foley; $150,000.00 to Joy Foley; and $100,000.00 each to Nikolas and Dylan Foley.
*643 For the foregoing reasons, we affirm in part, reverse in part and render judgment as stated above.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.
GORBATY, J. concurs in part and dissents in part with reasons.
GORBATY, J. Concurring in Part and Dissenting in Part.
I concur with the majority that Entergy Louisiana, Inc. ("ELI") was entitled to present evidence of the negligence and fault of third parties. Likewise, I find no fault on the part of Latter and Blum and WFMFT.
I respectfully dissent from the majority's decision to reverse the trial court's apportionment of fault. An appellate court's review of a trial court's findings is governed by the manifest error (i.e. clearly erroneous) standard. Stobart v. State of La. through DOTD, 617 So.2d 880 (La. 1993); Rosell v. ESCO, 549 So.2d 840 (La. 1989). Where there is conflict in testimony, reasonable inferences of fact should not be disturbed on review even if the appellate court may feel that its own evaluations and inferences are just as reasonable. If the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if it is convinced that it would have weighed the evidence differently if it had been sitting as the trier of fact. Id.
It is well accepted that the trier of fact is charged with the determination of how much credibility it assigns to expert witnesses, and therefore with the determination of which expert witness among those testifying is more credible. Lasyone v. Kansas City Southern R.R., 2000-2628 (La.4/3/01), 786 So.2d 682. Credibility determinations, including the evaluation of expert testimony and the resolution of conflicts in such testimony, are factual issues to be resolved by the trier of fact, and therefore must not be disturbed on appeal in the absence of manifest error. Id.
As with other factual determinations, a trier of fact is vested with much discretion in its allocation of fault. Thonn v. Cook, XXXX-XXXX (La.App. 4 Cir. 12/10/03), 863 So.2d 628. Therefore, an appeals court should only disturb the trier of fact's allocation of fault when it is manifestly erroneous.
In the instant case, the power line, which ran in front of Building "D" of the Feliciana apartment complex, was part of an Entergy single phase line system that consisted of two separate wires: a neutral "shield" line that did not carry an electrical current, and a live "phase" line that carried 8,000 volts of electricity. Entergy's sole method of insulating its live power lines at the complex of the three story buildings was "insulation by isolation," which consisted of stringing lines at a vertical height believed to be out of reach. There were no warning signs or instrumentalities, such as orange foam balls, on or in the vicinity of the lines.
The record shows that the configuration of the two wires played a primary role in the plaintiff's accident. At Building D, the neutral shield line was strung directly above the live phase line, with a distance of approximately three feet separating the lines. At sixteen of the twenty-three identical apartment buildings in the Feliciana complex, the neutral shield line was instead placed directly under the live phase line. At seven of the twenty-three buildings, including Building D, the neutral shield line was placed directly above the live phase line. Thus, persons raising a ladder or other object in front of those seven buildings were not afforded the same element of protection as was available at the other sixteen buildings where *644 the neutral shield line was in the bottom position, and the live phase line was in the higher, harder to reach position. With respect to a worker raising a ladder from the ground, placement of the neutral shield line would provide an extra margin of safety.
ELI's single phase line systems at all other nearby apartment complexes that also had three-story apartment buildings consisted exclusively of the safer configuration, from the perspective of human safety, of locating the neutral shield lines below the live phase lines. This unshielded construction comported with Entergy's mandatory safety policy documented as "single-phase laterals will be constructed unshielded." If ELI had used this safer configuration of placing the neutral shield line in the bottom position, the accident probably would not have occurred.
At the pointing front of Building D where plaintiff and his co-worker raised their un-extended ladder, there was a 15.63 foot horizontal clearance between Entergy's two lines and the front side of the building. The live phase line that carried the 8,000 volts of electricity was strung at a vertical distance of 18.83 feet above the ground. The neutral shield line that was above the phase line was strung at a vertical distance of 21.25 feet above the ground. The evidence showed that plaintiff's ladder was un-extended at the time of the accident. In its un-extended state, the ladder was 20.25 feet tall, thus capable when raised of contacting the lower strung live phase line, but not capable of contacting the higher strung neutral shield line. Therefore, if the live phase line in front of Building D had been above, instead of below, the neutral shield line, plaintiff's un-extended ladder could not have contacted the live phase line.
Duty-risk is the appropriate analysis in an action brought against an electric utility company for negligence. Pillow v. Entergy Corp., 36-384 (La.App. 2 Cir.9/18/02), 828 So.2d 83. Because high power lines are inherently dangerous, utility companies that maintain and employ high voltage electric power lines are required to exercise the utmost care to reduce hazards to life as far as to properly insulate them, or give adequate warnings of the danger, or to take other proper and reasonable practical steps. Id.
Evidence of prior similar accidents in which a worker was electrocuted is admissible and relevant for showing that Entergy's live phase line in front of Building D was dangerous and that Entergy knew of the dangerous condition it posed. Davis v. Louisiana Power & Light Company, 92-0082 (La.App. 4 Cir.12/29/92), 612 So.2d 235. In an electrocution case involving Entergy's predecessor, and that resulted in the plaintiff's death, the Louisiana Supreme Court stated that a live power line is one of the most dangerous things known to man. Dobson v. LP & L, 567 So.2d 569 (La.1990). The Supreme Court further stated that "[n]ot only is the current deadly, but the danger is hidden away in an innocent looking wire ready at all times to kill or injure anyone who touches it or comes near to it. For the average citizen, there is no way of knowing whether the wire is harmless or lethal until it is too late to do anything about it." Id.
Applying the foregoing principals of law to the situation at hand, I cannot say that the trial court erred in finding ELI liable in this matter. The electrocution of the Davis brothers nearly twelve years prior to plaintiff's electrocution, at virtually the same spot in front of Building D, and by the same unmodified instrumentality, rendered this accident foreseeable to ELI. The distinguishing difference between the present case and Davis is the fact that a prior accident occurred. Despite knowing *645 that an injury occurred at nearly the same exact spot where Jeremy Foley's injury occurred, ELI took no action to make that particular power line safer.
In Davis, this court held that LP & L was not liable because they did not receive reports of similar accidents. Clearly, the Davis and Foley accidents are similar. ELI was aware after Davis's accident that workers using aluminum ladders to repair or maintain the apartment building in the vicinity of that power line could come in contact with that line. However, ELI did little if anything to take corrective action. The evidence at trial showed that the cost for raising and inverting the lines would have been minimal, if not inconsequential. Instead of exercising the requisite utmost care with respect to its lines in front of Building D, the evidence indicates that Entergy instead exercised minimal care. The final sag that existed in ELI's lines at the time of plaintiff's electrocution, the damage to the guy line at the pole where the lines were connected, and the aberrant vertical clearance of the lines in front of Building D, along with the totality of the evidence in this case, shows that ELI breached its duty to make certain that its live power lines remained insulated by its self-chosen method of insulation by isolation. The record shows that ELI's conduct created a great risk to plaintiff, and its breaches of its aforementioned duties were a cause-in-fact of the plaintiff's injuries. As such, I would find that the trial court properly assigned thirty-five percent of the fault to ELI.
I would further affirm the trial court's ruling that Robertson Roofing breached its duty to train Jeremy Foley and Jason Rodriguez properly and to provide them a safe work environment. The trial court properly gave evidentiary weight to the alleged violation of Occupational Safety and Health Administration ("OSHA") regulations by plaintiff and his employer, in a context in accordance with the law and the particular facts and circumstances of this case. Robertson Roofing failed to train Foley and Rodriguez regarding applicable OSHA regulations requiring: (1) that an employer instruct each employee in the recognition and avoidance of unsafe conditions on the jobsite and the regulations applicable to his work; (2) that an employer train unqualified persons in electrically safe work practices within their respective jobs; (3) that employees working on the ground in the vicinity of overhead power maintain a minimum of ten feet of clearance from the lines; (4) that ladders with conductive side rails not be used in the vicinity of overhead power lines; and (5) that if Foley and Rodriguez could not maintain the required ten-foot clearance from the power liens, they were required to notify ELI of that fact so that ELI could take appropriate measures, such as de-energizing the line, to eliminate the risk of an unintended electric contact accident.
Robertson Roofing also failed to comply with OSHA regulations requiring that an employer perform a pre-job safety analysis to ascertain whether there are electrical hazards on the work site that might cause electric shock injuries and then to warn its employees of the hazards and determine work methods to mitigate the risk of shock.
Robertson Roofing additionally failed to supervise Foley and Rodriguez properly to insure that they performed the work at the Feliciana Apartments in conformance with OSHA regulations that require that work not be done by unqualified persons within ten feet of an energized overhead line that prohibit the use of aluminum ladders in the vicinity of an energized overhead line. In light of these factors, I would find that the trial court properly found Robertson *646 Roofing forty percent at fault in this accident.
The record also supports an assignment of twenty percent of the fault to the plaintiff himself. Plaintiff did use an aluminum ladder in the vicinity of live power lines. However, the lack of uniformity of ELI's lines at the Feliciana complex, the minimal cost to Entergy to have taken corrective action, the fact that plaintiff and his co-worker had safely raised their aluminum ladder sixty to seventy other times at the other buildings in the complex, the fact that the Davis electrocution went virtually unheeded by Entergy but also made plaintiff's accident foreseeable, and the totality of the facts and circumstances of this case, properly prevent the assignment of a greater magnitude of fault to the plaintiff.
Acting in conjunction with the negligence of plaintiff, Jason Rodriguez was also at fault for causing or contributing the accident, because he was clearly aware of the danger of overhead power lines and the risks attendant on raising their aluminum ladder in the vicinity of those lines. Nevertheless, he assisted Foley in improperly working near the power lines. He, too, was aware of Robertson Roofing's policies, and he could and should have encouraged Foley to use proper and safe work procedures. As such, I would find that the trial court did not err in assigning five percent of the fault to Rodriguez.
Accordingly, for the foregoing reasons, I would affirm in part, reverse in part, and render the judgment of the trial court.
NOTES
[1] In Dobson, the Supreme Court found that LP & L was 60% at fault where a tree trimmer was electrocuted when he contacted uninsulated power lines. The Supreme Court reasoned that LP & L was in a superior position to correct the problem when it apportioned a majority of fault to LP & L.