946 So.2d 144 (2006)
Jeremy Dean FOLEY and Joy Dawn Foley, Individually and on Behalf of their Minor Children, Nikolas Foley and Dylan Foley
v.
ENTERGY LOUISIANA, INC., Feliciana, a Louisiana Partnership in Commendam and Latter & Blum, Inc.
No. 2006-C-0983.
Supreme Court of Louisiana.
November 29, 2006.
Rehearing Denied February 2, 2007.
*148 Kenneth P. Carter, Catharine O. Gracia, Margaret J. Savoye, New Orleans, Louis L. Galvis, for Applicant.
Connick & Connick, William Peter Connick, Metairie, Collins C. Rossi, Covington, Patrick G. Kehoe, Jr., for Respondent.
WEIMER, Justice.
This case arises out of a suit for personal injuries sustained when twenty-four-year-old roofer Jeremy Foley ("Foley") and a co-worker raised a twenty-foot aluminum ladder into an overhead, uninsulated 8,000 volt electric power distribution line owned and operated by Entergy Louisiana, Inc. ("Entergy"). Foley was catastrophically injured and requires life-long institutionalized care.
Following a bench trial, the district court rendered judgment in favor of plaintiffs and against defendant Entergy, awarding damages totaling $4,735,297.70 to Foley, his wife, and their two minor children.[1] *149 In rendering its judgment, the district court found that Foley; his employer, Robertson Roofing and Siding, Inc. ("Robertson Roofing"); his co-worker, Jason Rodriguez ("Rodriguez"); and the power company, Entergy, each negligently contributed to the accident, and apportioned responsibility as follows: 20% to Foley, 5% to Rodriguez, 40% to Robertson Roofing, and 35% to Entergy. On appeal, the court of appeal affirmed the district court's finding of negligence on the part of Entergy, but reversed the court's allocation of fault, reducing Foley's percentage of fault to 5% and increasing Entergy's fault to 50%. We granted certiorari to review the court of appeal's judgment affirming the district court's liability determination, but reversing the apportionment of fault between the respective actors by the trier of fact. Finding no error in the court of appeal's conclusion assessing the defendant power company with at least partial responsibility for the damages occasioned by the accident, we nevertheless conclude that the court of appeal erred in reversing the district court's assessment of the percentages of fault attributable to the respective actors. Finding no clear or manifest error in apportionment of fault by the trier of fact, we reverse the decision of the court of appeal regarding apportionment and reinstate the judgment of the district court.

FACTS AND PROCEDURAL HISTORY
The accident that gives rise to this litigation occurred on the afternoon of November 12, 1998, at the Feliciana Apartments, located on Manhattan Boulevard in Harvey, Louisiana. The Feliciana Apartments are adjacent to and identical in layout to their sister apartments, Alouette. The Feliciana/Alouette complex consists of approximately 23 three-story apartment buildings that receive electric power through overhead transmission lines owned and operated by Entergy.
For approximately two months preceding the accident, Foley and his co-worker, Jason Rodriguez, both employees of Robertson Roofing, had been performing repairs to the roofs at the Alouette Apartments. In order to access the roofs of the apartment buildings, Foley and Rodriguez used an aluminum "three-story" extension ladder supplied by their employer. While capable of being extended to a length of 40 feet, when unextended the ladder measured 20.25 feet in length.[2] Foley and Rodriguez followed the same procedure each time they positioned the ladder. The men would slide the ladder off the rack of the company's pick-up truck and lay it flat on the ground, perpendicular to the apartment building on which they planned to work. One of the men would then "foot" the ladder by placing his foot against the bottom rung, while the other individual would "walk" the ladder up by walking toward the building, raising the ladder rung by rung as he passed under it, until it was upright and leaning against the side of the building. By the morning of the accident, Foley and Rodriguez had employed this same procedure to position the ladder at the apartment complex at least 60 to 70 times, each time raising the ladder without incident, and, more specifically, without making contact with any overhead power lines.
On November 12, 1998, Foley and Rodriguez had completed their work at the Alouette Apartments and had moved on to the Feliciana buildings. An overhead *150 transmission line runs in front of Buildings A, C, and D of the Feliciana complex, which are adjacent to each other. On the morning of the accident, Foley and Rodriguez performed repairs to the roofs at Feliciana Buildings A, B, and C, raising their ladder under the transmission line in front of Buildings A and C without incident. Following a lunch break, the two men proceeded to Building D of the complex to begin repairs to the roof of that building. In front of Building D, Foley and Rodriguez followed the same procedure they had followed on 60 to 70 previous occasions, and in particular, that very morning, under the same transmission line that also runs in front of Buildings A and C. Positioning the base of the ladder approximately 9.4 feet from the wall of Building D, on the grass between the sidewalk and the building, Rodriguez "footed" the rung closest to the building, while Foley "walked" the ladder up, rung by rung, toward the building. As the top of the ladder neared the overhead transmission line, Foley became distracted and abruptly looked down, rubbing his eye as if something had become lodged in it. At that moment, the ladder contacted the power line. Rodriguez was thrown backward by the surge of the electric current running through the ladder, landing behind an air conditioning unit. Foley fell to the ground, unconscious.
Entergy's sole method of insulating its live power lines at the complex of three story buildings is "insulation by isolation," a term used in the industry to signify that an uninsulated line is placed high enough to avoid contact by persons and things. There are no warning signs or instrumentalities, such as orange foam balls, on or in the vicinity of the uninsulated lines. Further, the transmission line that runs in front of Feliciana's Building D is part of an Entergy single phase line configuration that consists of two separate wires: a neutral "shield" wire that does not carry an electrical current, and a live "phase" wire that carries approximately 8,000 volts of electricity. At Building D, the neutral shield wire was strung roughly parallel and directly above the live phase wire, with a distance of approximately three feet separating the lines. At 16 of the 23 identical buildings in the Feliciana/Alouette complex, the neutral shield wire was placed directly below the live phase wire, thereby affording an extra margin of safety to those working under the transmission line. At only 7 of the 23 buildings, including Building D, was the live phase wire placed below the higher, harder to reach neutral shield wire. Moreover, an examination of ten other three-story apartment complexes in the area revealed that at all ten complexes, Entergy employed the "unshielded" configuration,[3] with the neutral shield wire located below the live phase wire. The seven buildings at Feliciana using the "shielded" configuration were the only ones in the area to do so.
At the point in front of Building D at which Foley and Rodriguez positioned *151 their ladder, the live phase wire that carried 8,000 volts of electricity was strung at a vertical distance of 18.83 feet above the ground; the neutral shield wire that was strung above the live phase wire was strung at a height of 21.25 feet from the ground. It is undisputed that the energized wire in front of Building D was the only wire in the complex strung at a height of less than 20 feet above the ground.
It is also undisputed that approximately 12 years prior to Foley's accident, two painters, Carl and Craig Davis, received electrical shock injuries when Craig Davis raised an aluminum ladder into the same transmission line that runs in front of Feliciana's Building D, approximately 34.45 feet from the exact site of Foley's accident. Between the time of the Davis accident and the instant accident, Entergy did not make any changes or effect any alterations to its power line.
As a result of the accident, Foley sustained severe and catastrophic brain damage that has left him functioning at the level of a four year old. His cognition, intellect, memory, judgment, orientation, attention, ability to process thoughts, abstract reasoning, and emotional stability have all been severely impaired. He will require care in an institutionalized setting for the remainder of his life. At the time of the accident, Foley was a twenty-four year old married male, with two small sons, Nikolas and Dylan.
Foley and his wife, Joy, individually and on behalf of their two minor children, brought a suit for damages against Entergy and two other entities: WMFMT Real Estate Limited Partnership ("WMFMT"), the owner of the Feliciana Apartments; and Latter & Blum Property Management, Inc. ("Latter & Blum"), the agency that managed the property. Robertson Roofing and its insurer filed a petition of intervention, seeking to recover amounts paid to Foley pursuant to the Worker's Compensation Act. Both WMFMT and Latter & Blum were dismissed from the case on summary judgment, prior to trial. The case was subsequently tried as a bench trial. At the commencement of the proceedings, the district court ruled that it would not allow Entergy to introduce evidence of fault on the part of previously dismissed co-defendants, WMFMT and Latter & Blum. Entergy submitted a proffer.
At the conclusion of trial, the district court rendered judgment in favor of plaintiffs and against Entergy, awarding Jeremy Foley $4,735,297.70 in general and special damages. Joy Foley was awarded $105,000.00 for loss of consortium, and Nikolas and Dylan Foley were each awarded $70,000.00. Robertson Roofing and its insurer were awarded $575,673.87 on the intervention claim.
In reaching its verdict, the district court found that Entergy was responsible for several negligent acts or omissions that caused Foley's injuries. In particular, the court found that the injury to the Davis brothers nearly 12 years prior to Foley's accident, at virtually the same spot in front of Building D and by the same unmodified instrumentality, made this accident foreseeable. Despite Entergy's actual knowledge that an injury had occurred at virtually the same exact spot at which Foley's injury occurred, the district court found that Entergy took no action to make that power line safer for people passing in proximity to the line. Entergy did not adequately inspect its line, raise the line, adjust the final sag in the line and/or invert the neutral shield wire with the live phase wire. The court concluded that Entergy's lack of uniformity in stringing its lines at the Feliciana complex contributed to the accident. It specifically rejected Entergy's explanation that use of the *152 shielded configuration, with the neutral wire above the live phase wire, was reasonable as a means of protecting against lightning strikes, noting that only 7 of the 23 buildings in the complex used this configuration. The court found that, at only 18.83 feet above the ground, Entergy's live phase wire in front of Building D presented an unreasonable risk of harm. This conclusion was based on a number of factors: (1) the prior accident at the same site; (2) the presence of tenants and other persons regularly traversing under the live phase wire; (3) the fact that the power lines in front of Building D are substantially below the highest points of wires strung in the immediate area, including the roof line of Building D, and below the other phase lines at the complex; and (4) the minimal cost to Entergy of remedying the condition.
While the district court found Entergy responsible for fault that was a cause-in-fact and legal cause of Foley's injuries, the court did not find Entergy to be the only negligent actor. The court found that Foley's employer, Robertson Roofing, was also negligent in failing to properly train and supervise Foley and Rodriguez and in failing to provide the men with a safe work environment. The court determined that Foley himself was negligent in using an aluminum ladder in the vicinity of live power lines, and that his co-worker, Jason Rodriguez, was also at fault because he was clearly aware of the danger of overhead power lines and the risks attendant on raising an aluminum ladder in the vicinity of power lines and, nevertheless, proceeded to assist Foley in raising the ladder. Based upon the court's assessment of their relative degrees of culpability, the court assigned to each negligent actor the following percentages of fault: Robertson Roofing, 40%; Jeremy Foley, 20%; Jason Rodriguez, 5%; and Entergy, 35%.
Both Entergy and Foley appealed the district court judgment. On February 15, 2006, a five-judge panel of the Court of Appeal, Fourth Circuit handed down its opinion in this matter. Foley v. Entergy Louisiana, Inc., 04-1967 (La.App. 4 Cir. 2/15/06), 925 So.2d 638. The court first addressed Entergy's contention that the district court erred in denying Entergy the right to introduce evidence at trial of the fault of Latter & Blum and WFMFT, entities that had been dismissed from the suit prior to trial on motions for summary judgment as statutory employers of Foley. Citing this court's decisions in Keith v. United States Fidelity & Guaranty Company, 96-2075 (La.5/9/97), 694 So.2d 180, and Dumas v. State, Department of Culture, Recreation & Tourism, 02-0563 (La.10/15/02), 828 So.2d 530, the court of appeal held that LSA-C.C. art. 2323 requires that the fault of every person responsible for a plaintiff's injuries be compared, whether or not such person is a party, and regardless of the legal theory of liability asserted against such person. Accordingly, the court concluded that the district court erred in depriving Entergy of the opportunity to present evidence of third party fault. However, after reviewing the evidence proffered by Entergy, the court of appeal concluded that Latter & Blum and WFMFT were not in any way at fault in causing Foley's accident, and therefore declined to assign a percentage of fault to these entities.
The court of appeal next reviewed the percentages of fault assigned to the various negligent actors by the district court. Evaluating the conduct of the parties pursuant to the factors outlined in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), the court of appeal concluded that the district court was "clearly wrong" in its apportionment of fault. The court reasoned that because Entergy had knowledge of the danger presented *153 by the wires as a result of the previous accident and did little if anything to take corrective action, and because it was the superior actor with the duty to exercise "utmost care" to reduce hazards to life, it should bear a greater percentage of the fault for this accident. Because Foley was the party with the inferior capacity to avoid and/or correct the hazardous condition, the court found that he should bear a lesser percentage of fault. Accordingly, the court of appeal increased the fault assigned to Entergy to 50% and reduced the percentage of fault assigned to Foley to 5%. The fault assigned to the others was left unchanged.
Upon Entergy's application, we granted certiorari to review the liability determination in this case, and the court of appeal's action in reversing the district court's allocation of the percentages of fault attributable to the respective actors. Foley v. Entergy Louisiana, Inc., 06-0983 (La.6/30/06), 933 So.2d 130.

STANDARD OF REVIEW
The Louisiana Constitution provides that our jurisdiction in civil cases extends to both law and facts. LSA-Const. art. V § 5(C). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving this court the power to decide factual issues de novo. The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's factual findings will not be upset unless they are manifestly erroneous or clearly wrong. Ferrell v. Fireman's Fund Insurance Co., 94-1252, pp. 3-4 (La.2/20/95), 650 So.2d 742, 745. Under this rule, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State, Department of Transportation & Development, 617 So.2d 880, 882 (La. 1993). If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. at 882-883.
When the findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of fact, for only the fact finder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, a reviewing court may well find manifest error even in a finding purportedly based upon a credibility determination. Id. Where such factors are not present, however, and a fact finder's determination is based on its decision to credit the testimony of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id. The rule that questions of credibility are for the trier of fact applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. Lasyone v. Kansas City Southern Railroad, 00-2628, p. 13 (La.4/3/01), 786 So.2d 682, 693.
These standards for manifest error review are not new. These standards are the guiding principles that aid our review of a trial court's factual determinations. A manifest error review is applicable to the fact-driven determinations presented in this case, including the finding of percentages of fault by the trier of fact. Clement *154 v. Frey, 95-1119, p. 7 (La.1/16/96), 666 So.2d 607, 610.

LAW AND ANALYSIS
Entergy's Fault
In cases of injury occurring as a result of contact with overhead power lines, principles of negligence, rather than absolute or strict liability, apply, and we assess the liability of the various parties to the accident under a duty-risk analysis. Hebert v. Gulf States Utilities Company, 426 So.2d 111, 114 (La.1983); Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982). To establish the liability of an electric utility company using the duty-risk analysis, the plaintiff has the burden of proving: (1) that the defendant power company owed a duty to the plaintiff; (2) that the power company breached that duty; (3) that the power company's conduct was a cause-in-fact of the plaintiff's injuries; (4) that the power company's substandard conduct was a legal cause of plaintiff's injuries; and (5) that the plaintiff suffered actual damages. Perkins v. Entergy Corporation, 00-1372, 00-1387, 00-1440, p. 7 (La.3/23/01), 782 So.2d 606, 611; Fowler v. Roberts, 556 So.2d 1, 4 (La.1989) on reh'g, 556 So.2d at 13 (La. 1990); Fleniken v. Entergy Corporation, 00-1824 (La.App. 1 Cir. 2/16/01), 780 So.2d 1175, 1184, writ denied, 01-1268, 01-1305, 01-1317 (La.6/15/01), 793 So.2d 1250, 1253, 1254.
In Simon v. Southwest Louisiana Electric Membership Corporation, 390 So.2d 1265, 1267 (La.1980), we summarized the duty of an electric utility company in cases involving injury sustained through contact with high voltage lines. Given the inherently dangerous nature of electricity, we held that electric companies that use and maintain high voltage power lines are required to exercise the utmost care to reduce hazards to life as far as is practicable. Id. If it should be reasonably anticipated that persons may come into contact with electric lines, the owner and/or operator of those lines is required to insulate them, or to give adequate warning of the danger, or to take other proper and reasonable precautions to prevent injury. Id. However, an electric company is not under a duty to safeguard against occurrences that cannot be reasonably expected or contemplated: "[O]perators of power lines are not required to anticipate every possible accident which may occur and are not the insurers of safety of persons moving around power lines in the course of everyday living." Simon, 390 So.2d at 1268. When an accident or occurrence could not have been reasonably anticipated, it is not within the scope of the duty owed by the electric company to the injured party because there is no ease of association between the risk presented by the electric company's conduct under the overall circumstances and the resulting injury. Hebert, 426 So.2d at 114.
Nevertheless, an electric company is held to the standard of a reasonable person with superior attributes, and is required to recognize that there will be a certain amount of negligence that must be anticipated. See Levi v. Southwest Louisiana Electric Membership Cooperative (SLEMCO), 542 So.2d 1081, 1084-1086 (La.1989); Pillow v. Entergy Corporation, 36,384, p. 5 (LaApp. 2 Cir. 9/18/02), 828 So.2d 83, 87, writ denied, 02-2575 (La.12/13/02), 831 So.2d 987. Pursuant to this duty, an electric company has an obligation to make reasonable inspections of wires and other instrumentalities in order to discover and remedy hazards and defects. Levi, 542 So.2d at 1084. This duty includes the obligation to inspect its lines to determine if uninsulated high voltage lines pose a risk of harm, and if the utility *155 relies on insulation by isolation, it has a duty to make certain its lines remain isolated. Hebert, 426 So.2d at 116; Fleniken, 00-1824 at 13, 780 So.2d at 1186.
Before this court, Entergy vigorously contests the determination of the lower courts that it was required to recognize that the transmission of electricity through its uninsulated line in front of Building D involved a risk of causing harm in the manner sustained by Foley. In other words, Entergy argues that the accident that occurred in this case could not be reasonably expected or contemplated, and that, as a result, it was under no duty to protect Foley against the harm that materialized.
A power company is required to recognize that its conduct involves a risk of causing harm to another if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would, and if the company has in fact more than a minimum of these qualities, the standard becomes that of a reasonable person with superior attributes. Levi, 542 So.2d at 1084.
The testimony at trial established that Robertson Roofing had been performing repairs to the roofs of the buildings comprising the Feliciana/Alouette complex at various times since 1991, and that Jeremy Foley and Jason Rodriguez had been working regularly at this site for at least nine weeks prior to the accident. James Hickman, Entergy's network manager for the Westbank, testified that Entergy representatives had been out at the complex inspecting the electrical poles near Building D the same month the accident occurred. Keith Duplechane, the operations coordinator for the Westbank network on the date of the accident, testified that he was aware of a prior accident at the exact same location. In fact, the parties stipulated that on December 8, 1986, while working as painters at the Feliciana Apartments, Craig and Carl Davis received electric shock injuries when Craig Davis moved an aluminum ladder into the same power line in front of Building D, about 34.45 feet from the point at which Foley's ladder came in contact with the line. Between the date of the Davis accident in 1986 and the 1998 injury to Foley, Entergy did not make any changes or alterations to this power line.
In written reasons, the district court determined that the injury to the Davis brothers nearly 12 years earlier, at virtually the same spot in front of Building D, and by the same unmodified instrumentality, rendered this accident foreseeable to Entergy. In other words, the district court found that Entergy had actual knowledge, after the Davis accident, that workers using aluminum ladders to repair or maintain the apartment building in the vicinity of that power line could come in contact with that line, and yet did nothing to correct or alleviate the hazard.
Entergy points out that as a result of their accident, the Davis brothers filed suit against Entergy's predecessor, Louisiana Power and Light Company ("LP & L"), alleging that the power company was negligent in its installation and maintenance of the transmission line in front of Building D. A jury exonerated the power company from liability with respect to the injuries sustained by Carl Davis, but cast it with 24% of the responsibility for Craig Davis's injuries. On appeal, the fourth circuit affirmed the jury's allocation of liability with respect to Carl Davis's injuries, and amended the assessment of liability for Craig Davis's injuries from 24% to 0%, finding the power company to be free from negligence with respect to both plaintiffs. Davis v. Louisiana Power & Light Co., *156 612 So.2d 235 (La.App. 4 Cir.1992), writ denied, 615 So.2d 336 (La.1993). Entergy argues that ruling of the court of appeal in Davis, exonerating it of liability for the Davis accident, precludes any finding of negligence on its part with respect to this accident. Entergy points out that the Davis court specifically found that the clearances of the power line in front of Building D exceeded the industry standards set forth in the National Electric Safety Code (NESC) and that LP & L had not received any reports of similar accidents occurring at that location. Therefore, LP & L had no actual or constructive knowledge that the location or the method of construction of the line at the Feliciana Apartments presented an unreasonable risk of harm. Davis, 612 So.2d at 237. In addition, the Davis court concluded that, under the particular circumstances of that case, the possibility of injury or loss to the Davis brothers did not constitute an unreasonable risk of harm. Id. Entergy asserts that its conduct in failing to make any alterations to its power line post-Davis was entirely reasonable; that in light of the Davis decision, it was not required to anticipate that another worker would negligently raise his ladder into the power line, the location or construction of which was determined by the court not to present an unreasonable risk of harm in the Davis case.
In effect, Entergy argues that the decision of the court of appeal in Davis is dispositive of the issue of its negligence here; that because the same power line was held not to present an unreasonable risk of harm under similar factual circumstances in Davis, it could not present an unreasonable risk of harm in this case. In advancing this argument, Entergy attempts to assert, indirectly, a form of issue preclusion that is simply not recognized in Louisiana law.[4] Moreover, Entergy's argument ignores an important distinguishing fact between the accident in Davis and that in the present case: Entergy's actual knowledge, post-Davis, that workers using aluminum ladders to repair or maintain the apartment building in the vicinity of that power line could come in contact with that line. Crucial for the court of appeal in the Davis decision was the fact that LP & L had not received any reports of similar accidents occurring at the apartment complex to put them on notice that there was a problem at that location. Davis, 612 So.2d at 237. That fact changed decisively and incontrovertibly with the injury to the Davis brothers. While Entergy argues that notice of the prior accident was not sufficient to impose upon the utility company a duty to a worker who negligently moves an aluminum ladder into a power line in plain and obvious view, this court has pointed out that the ordinary reasonable person, and even more so the power company, is required to recognize that there will be a certain amount of negligence in the world. "When the risk becomes serious, either because the threatened harm is great, or because there is an especial likelihood that it will occur, reasonable care may demand precautions against `that occasional negligence which is one of the ordinary incidents of human life *157 and therefore to be anticipated.'" Levi, 542 So.2d at 1086. As we have cautioned: "A high tension transmission wire is one of the most dangerous things known to man. Not only is the current deadly, but the danger is hidden away in an innocent looking wire ready at all times to kill or injure anyone who touches it or comes near to it. For the average citizen there is no way of knowing whether the wire is harmless or lethal until it is too late to do anything about it." Dobson v. Louisiana Power and Light Company, 567 So.2d 569, 572 n. 1 (La.1990).
The facts of the instant case reveal that the accident occurred in a residential apartment complex where it was reasonable to anticipate ongoing maintenance and repair work to the buildings. Moreover, the buildings in the complex are three stories tall, putting workers attempting to effect repairs to the buildings even closer to the overhead power lines. As a reasonable actor with superior attributes, Entergy should have recognized the risk of those workers using ladders to access the buildings coming in contact with its lines, which are generally strung at a height at or near the roof lines of the buildings.[5] In fact, the evidence establishes that the power line in front of Building D, where the accident occurred, is strung about a foot lower than the lines in front of the surrounding buildings, making an accident at that particular location even more foreseeable. Furthermore, at 16 of the 23 identical buildings in the complex, a neutral shield wire was strung below the energized wire, affording an extra margin of safety of approximately 3 feet to those who might be found working under the line. For reasons that Entergy could not explain, at only seven buildings, including Building D, was the energized wire strung below the neutral shield wire.
Given these facts, we find no clear error in the district court's conclusion that Entergy, with its superior knowledge, skill and experience in electrical safety, should have recognized that its conduct under these circumstances involved a risk of harm to workers, like Foley, hired to perform maintenance and repair work to the buildings at the Feliciana Apartments. While Entergy complains that it did not have actual knowledge of the roofing work being conducted at the complex in the vicinity of its overhead wires at the time of the accident and, therefore, should not be charged with an obligation to protect against the dangerous activity, it is undisputed that Foley and Rodriguez had been working regularly at the complex for at least nine weeks prior to the accident. Entergy introduced evidence that its representatives were at the complex inspecting its poles during the month of the accident. At a minimum, the roofing activity should have been observed by Entergy's representatives, alerting them to the potential hazard. Such constructive knowledge of contemporaneous activity at the complex, coupled with Entergy's actual knowledge of the previous injury to the Davis brothers at this same site, fully supports the district court's determination that the accident in the instant case was foreseeable and within the scope of the duty owed by the utility company to the injured Foley.
Entergy next contests the district court's determination that the risk of harm *158 encountered by Foley was an unreasonable one. In other words, Entergy challenges the district court's factual determination that the power company breached its duty to take precautions and/or protect against the foreseeable risk that materialized in this case.
Once again, Entergy relies on the Davis case to support its argument. Entergy asserts it was reasonable to rely on the Davis court's finding that the power lines at the Feliciana Apartments did not present an unreasonable risk of harm to workers like the Davis brothers in order to avoid taking any further actions or precautions with respect to this same overhead power line in the 12-year period that elapsed after the Davis accident. The power company points out that the court of appeal in Davis, specifically found that its power line at this location was in full compliance with, and in fact exceeded, the industry standards set forth in the NESC, and disputes the contrary fact finding of the district court in the instant case. Davis, 612 So.2d at 237.
It is well settled in our jurisprudence that initial compliance with the NESC does not, per se, relieve the power company of liability. Simon, 390 So.2d at 1268; Hebert, 426 So.2d at 115; Pillow, 828 So.2d at 89; Aucoin v. Louisiana Power & Light Company, 490 So.2d 1088, 1089-1090 (La.App. 3 Cir.), writ denied, 491 So.2d 381 (La.1986). Where, as here, the power company's sole method of insulating its live power lines is "insulation by isolation," additional inquiry must be made concerning the actual continuing effectiveness of such insulation. Hebert, 426 So.2d at 115. As we pointed out in Hebert: "Insulation by isolation is maintained until something intervenes. Just as time, climate, blows or other circumstances may deteriorate rubber insulation coating a wire, so insulation by isolation may deteriorate with a changing environment." Hebert, 426 So.2d at 116. Protective measures, previously deemed sufficient to avoid workplace accidents, may become insufficient because of activity and altered circumstances in the area. Fleniken, 780 So.2d at 1186. If a power company relies on insulation by isolation, it has a duty to make certain the lines remain isolated. Pillow, 828 So.2d at 87; Fleniken, 780 So.2d at 1186.
In the instant case, the district court concluded that Entergy breached its duty to insure that its energized power lines remained safely insulated by its self-chosen method of insulation by isolation. Specifically, the district court found that "at only 18.83 feet above the ground, Entergy's live phase line in front of Building D posed an unreasonable risk of harm and was a cause-in-fact of plaintiff's injuries under the particular facts and circumstances of this case." The district court's conclusion in this regard is based on its evaluation of both expert and lay testimony presented by the parties.
At trial, the parties offered conflicting expert testimony as to whether the power line in front of Building D in fact complied with the provisions of the 1981 edition of the NESC, the edition of the code in effect at the time the power line was constructed. With respect to the vertical clearance restrictions for such lines, the parties, and their experts, cited alternate provisions of the NESC as controlling. Frank Denbrock, Entergy's expert, opined that Table 231-1 of Rule 234 controls in this case. According to Table 231-1, when a power line crosses over or overhangs spaces or ways accessible to pedestrians only, the required vertical clearance is 15 feet.[6] *159 Because the line in front of Building D was strung at a vertical distance of 18.83 feet above the ground, Denbrock opined that Entergy's line not only met, but exceeded NESC requirements.
On the other hand, plaintiffs' expert, Andrew Lawyer, opined that Table 232-1 of Rule 234 controls. Table 232-1 requires a vertical clearance of 20 feet when the line passes over roads, streets, alleys, non-residential driveways, parking lots, and other areas subject to truck traffic. Because part of the span that runs in front of Building D crosses over a driveway between Building D and an adjoining building and because the area where the accident occurred is adjacent to a parking lot and is occasionally exposed to truck traffic,[7] Lawyer opined that the 20-foot vertical clearance rule applies and that Entergy's line, at 18.83 feet, failed to comply with the applicable NESC provision.
Faced with a clear choice, the district court concluded that the NESC's 20-foot vertical clearance rule is the more reasonable and practical rule to apply under the facts and circumstances of this case. This essentially factual evaluation and resolution of the conflicting expert testimony is a matter particularly within the province of the district court. Lasyone, 2000-2628 at 13, 786 So.2d at 693. Given the particular facts of this case, we cannot say that the district court's decision to credit the testimony of plaintiff's expert over that of Entergy's is clearly wrong. Id.
However, even were we to disagree with the district court's resolution of this issue and find the applicable vertical clearance to be 15 feet, it is clear, as we have noted, that compliance or non-compliance with the provisions of the NESC is not alone determinative of the issue of fault. Simon, 390 So.2d at 1268; Hebert, 426 So.2d at 115; Pillow, 36,384 at 10, 828 So.2d at 89. The avowed purpose of the NESC is to provide basic guidelines for safeguarding persons from hazards arising from the installation, operation, or maintenance of overhead electric supply lines, and its requirements reflect the minimum provisions considered necessary for the safety of employees and the public. Ayres v. Beauregard Electric Co-operative, Inc., 94-811, p. 13 (La.App. 3 Cir. 9/6/95), 663 So.2d 127, 134, writ denied, 95-2432, 95-2434 (La.12/15/95), 664 So.2d 455. Depending upon the unique facts and circumstances of a particular situation, compliance with such minimum standards may not always be adequate. Brock v. New Orleans Public Service, Inc., 433 So.2d 1083, 1087 (La. App. 4 Cir.), writ denied, 437 So.2d 1148 (1983) ("Section 20, Rule 202(A) of the 1977 N.E.S.C. reflects an awareness on the part of the drafters that compliance with minimum standards is not always adequate.").
In the instant case, the district court recognized this basic principle. After finding the 20-foot vertical clearance rule to be applicable, the court went on to hold that it would find the conduct of Entergy to be negligent even if the NESC's 15-foot vertical clearance rule did apply. Again, the district court based its determination on an evaluation of the expert and lay testimony.
Plaintiffs' expert testified that in addition to violating the applicable NESC vertical clearance rule, the power line in front *160 of Building D, where the accident occurred, violates another NESC rule, Rule 285, requiring uniformity in the construction and positioning of transmission lines.[8] According to Lawyer, the power line in front of Building D is the only live phase wire in the complex that is strung at a vertical distance of less than 20 feet from the ground. In fact, the elevation of the wire in front of Building A, at its lowest mid-point, is 25.23 feet. The elevation of the wire in front of Building C, at its lowest mid-point, is 21.22 feet; whereas the elevation of the wire in front of Building D, at its lowest mid-point, is 17.93 feet.[9] Lawyer testified that this lack of uniformity creates a serious hazard for workers in the position of Foley, who after performing repetitive tasks such as lifting a ladder without incident in front of adjacent buildings, are lulled into a false sense of security. The situation is made even more dangerous by the fact that when the worker approaches the area where the line is actually lower, looking up from the ground at that line, the distances appear to be the same.[10]
Lawyer testified that the use of the shielded configuration at this location, with the live phase wire strung approximately 3 feet below the neutral shield wire, also violates the uniformity requirement of NESC Rule 285 because only 7 of the 23 buildings in the apartment use this shielded configuration. At 16 of the buildings, the live phase wire is strung above the neutral wire, affording an extra margin of safety to those working or passing under the power line. Lawyer pointed out that the use of the shielded configuration for this single phase line is at variance with LP & L's own construction blueprint for such single phase lines.
Finally, Lawyer testified that the height of the power line in front of Building D did not conform with Entergy's own standards for permissible final line sag. Drawing from Entergy's Engineering Design/Practices Manual, Lawyer calculated the maximum allowable final sag of the power line in front of Building D (the allowable sag from its original stringing height after 10 years of service) to be 5.97 feet. Lawyer testified that had Entergy complied with that sag requirement, the mid-span height of the line in front of Building D would have been at 21.03 feet, averting the instant accident. According to Lawyer, the cost of raising or re-sagging the power lines in front of Building D would, at most, have been $1,750.00. Inverting the lines in front of Buildings A, C, and D would, he estimated, have cost approximately $2,100.00.
Lawyer's testimony was corroborated by that of another expert, Vincent Goodman. Goodman had been retained as an expert in the Davis case. He testified that after the Davis accident, he performed a safety risk assessment at this location and informed Entergy of his opinion that the live power line in front of Building D should be raised to a height of at least 20 feet. He also recommended that the live and neutral *161 lines be inverted. Despite these recommendations, Entergy made no alterations to the placement of its lines.
Entergy countered the testimony of plaintiffs' experts with expert testimony of its own. Entergy expert Frank Denbrock testified that the uniformity requirement of NESC Rule 285 has no application in this case because it is, by its own terms, intended to facilitate the identification of live wires by employees authorized to work on the lines. It has no application, and is not intended to protect, members of the general public. Denbrock opined that the overhead power lines in front of Building D were in full compliance with all applicable provisions of the NESC.
James Hickman, Entergy's manager of distribution standards, was also called to testify on the power company's behalf. Hickman explained Entergy's inspection procedures. According to Hickman, Entergy had reliability servicemen regularly assigned to patrol feeders and check for defects, contractors who performed pole inspections, and linemen who would report any problems they noted in the course of their work. Hickman verified that one of its contractors inspected the poles on either side of Building D in 1998. He stated that he had no knowledge of the work being conducted at the Feliciana Apartments at the time of the accident and received no requests to de-energize the lines at the complex. He also explained that as far as Entergy is concerned, as long as a power line exceeds the applicable NESC vertical clearance, it is of no moment if the final line sag exceeds Entergy's specifications. Finally, he explained that the primary purpose of the shielded configuration is to protect against lightning strikes and possible interruption of service, although it can also be used if the power company plans to add an additional load at that location which would require additional phases.
After considering the entirety of this testimony, the district court rejected as not credible Entergy's contention that the uniformity requirement of NESC Rule 285 is intended to protect only employees of the power company and not employees of other companies or the general public. The court questioned Entergy's explanation that use of the shielded configuration at only 7 of the 23 buildings in the complex was reasonable because it protected those lines against lightning strikes, and ultimately concluded that Entergy's position unacceptably places a higher value on protection of physical property than human life. Noting specifically the fact that Entergy's line was strung below the roof line of a residential apartment complex and substantially below the highest points in the immediate area, the lack of uniformity in the vertical heights of the live phase wires at the complex, the excessive sag in the line in front of Building D, and the minimal cost of remedying the risk, the district court concluded that Entergy breached its duty of exercising utmost care.
After reviewing the entirety of the record and the testimony in this case, we find that the district court's conclusion in this regard was a reasonable one, and that the court did not manifestly err in its resolution of this essentially factual issue. Mundy v. Department of Health & Human Resources, 620 So.2d 811, 813 (La.1993) (Whether the defendant has breached a duty is a question of fact to which the manifest error standard of review applies). Our conclusion in this regard is buttressed when we examine the balancing process that is at the heart of the negligence determination.
*162 In Levi v. Southwest Louisiana Electric Membership Cooperative (SLEMCO), supra, we held:
Since there are occasions when high voltage electricity will escape from an uninsulated transmission line, and since, if it does, it becomes a menace to those about the point of its escape, the power company's duty, as in other similar situations, to provide against resulting injuries is a function of three variables: (1) the possibility that the electricity will escape; (2) the gravity of the resulting injury, if it does; (3) the burden of taking adequate precautions that would avert the mishap. When the product of the possibility of escape multiplied times the gravity of the harm, if it happens, exceeds the burden of precautions, the failure to take those precautions is negligence.
Levi, 542 So.2d at 1087. See, L. Hand, J., in Conway v. O'Brien, 111 F.2d 611, 612 (2d Cir.1940). Applying the negligence balancing process in the present case, we find no error in the district court's conclusion that the possibility of injury to Foley constituted an unreasonable risk of harm, and that Entergy was, therefore, guilty of negligence that was a legal cause of Foley's injury.
As the facts of this case reveal, the likelihood that a worker's inattentiveness would allow a ladder to come in contact with a high voltage power line was greatest in front of Building D, where the live phase wire was strung at a height below all other phase wires in the complex and below the actual roof line of the residential apartment building it served, and where the live phase wire was positioned below the neutral shield wire. The fact that Foley had, on at least 60-70 prior occasions, raised his ladder successfully and without incident at other locations in the complex tended to make him less wary of the overhead lines at this location and thereby increased the likelihood of an accident. Given the convergence of these circumstances, there was a significant chance that the power company's conduct would cause harm to one or more workers like Foley, hired to perform maintenance and repair work to the apartment buildings.[11]
The gravity of the harm is extreme if the risk of making contact with energized electrical transmission lines takes effect. Levi, 542 So.2d at 1088 (Fatal or disastrous harm is likely to be caused by a high voltage electrical accident). The burden of taking precautions against that risk is, in this case, inconsequential. Entergy employee Keith Duplechane estimated that two workers could raise the live phase line in front of Building D to a height of 20 feet in about two to three hours and that it would take about an hour to an hour and a half to invert the live and neutral lines. Andrew Lawyer estimated that it would cost Entergy, at most, between $1,750.00 and $2,100.00, to complete either task. Given these circumstances, the minimal burden of adequate precautions in this case was clearly outweighed by the product of the chance and the gravity of the harm.[12]
*163 As indicated, there must be proof of five elements to establish liability on the part of Entergy. See, Perkins, 00-1372, 00-1387, 00-1440 at 7; 782 So.2d at 611. Our discussion thus far has focused on duty, breach of duty, and legal cause (the scope of duty element). There can be no dispute that Entergy's conduct in failing to adequately isolate and inspect its line was a substantial factor and, thus, a cause in fact of Foley's injuries. The damages sustained by Foley are both substantial and unrefuted. Our review of the record reveals that the district court did not manifestly err in finding Entergy to be at fault.
Remand for Determination of Latter & Blum and WFMFT Fault
At trial, Entergy attempted to introduce evidence of fault on the part of WFMFT, the owner of the Feliciana Apartments, and Latter & Blum, the agency retained to manage the property. Because these entities had been previously dismissed from the suit on motions for summary judgment as statutory employers of Foley, the district court ruled that it would not consider evidence of fault on the part of these statutorily immune entities. Entergy was allowed to proffer the excluded evidence it sought to elicit, and did so, submitting excerpts from the deposition testimony of three witnesses whose testimony Entergy deemed to be probative of the issue of fault on the part of WFMFT and Latter & Blum.
On appeal, the court of appeal correctly determined that the district court erred in excluding the evidence of third party fault, as LSA-C.C. art. 2323 clearly requires that the fault of every person responsible for a plaintiff's injury be compared, whether or not such person is a party, and regardless of the theory of liability asserted against such person. Dumas, 02-0563 at 12 (La.10/15/02), 828 So.2d 530, 537; Keith v. United States Fidelity & Guaranty Company, 96-2075 (La.5/9/97), 694 So.2d 180. After reversing the ruling of the district court that deprived Entergy of the opportunity to present evidence of third party fault, the court of appeal went on to examine the evidence of such fault submitted by Entergy by virtue of its proffer. Upon reviewing that evidence, and the record of the case in its entirety, the court of appeal concluded that WFMFT and Latter & Blum were not at fault in any way, and declined to assign a percentage of fault to either of these entities. Foley, 04-1967 at 4-5; 925 So.2d at 641-642.
Before this court, Entergy contends that the court of appeal erred in rendering judgment on the issue of third party fault on the basis of the record before it, rather than remanding the case to the district court for a new trial. It asserts that the evidence it submitted by virtue of the proffer was limited, and did not represent all the available evidence of fault it could have produced had it not been precluded from calling and examining at trial the witnesses whose testimony was only presented in the proffer by way of excerpts from their deposition testimony. Because the record is allegedly incomplete as to the issue of third party fault, Entergy maintains the judgment of both lower courts *164 must be vacated and the case remanded to the district court for a new trial and/or the receipt of additional evidence.
Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law, such as a consequential but erroneous ruling on the exclusion or admission of evidence, forecloses any finding of fact, and the record is otherwise complete, the appellate court should, if it can, render judgment on the record. Ragas v. Argonaut Southwest Insurance Company, 388 So.2d 707, 708 (La.1980); Gonzales v. Xerox Corporation, 254 La. 182, 320 So.2d 163 (1975). Nevertheless, LSA-C.C.P. art. 2164 provides that an "appellate court shall render any judgment which is just, legal and proper upon the record on appeal." It is well settled that an appellate court is empowered under this article to remand a case to the district court for the taking of additional evidence where it is necessary to reach a just decision and to prevent a miscarriage of justice. Vallo v. Gayle Oil Company, Inc., 94-1238, p. 9 (La.11/30/94), 646 So.2d 859, 866; Herbert v. Travelers Indemnity Co., 255 La. 645, 232 So.2d 463, 464 (1970); Anderson v. Casualty Reciprocal Exchange, 602 So.2d 282, 284 (La.App. 2 Cir. 1992); Winn State Bank & Trust Company v. Browning, 453 So.2d 286, 292 (La. App. 2 Cir.1984). Although a court should always remand a case whenever the nature and extent of the proceedings dictate such a course, whether or not any particular case should be remanded is a matter which is vested largely within the court's discretion and depends upon the circumstances of the case. Triche v. Regional Electric & Construction, Inc., 95-0105, p. 11 (La.App. 1 Cir. 10/6/95), 671 So.2d 425, 433-434; Huval Baking Company v. State, Worker's Compensation Second Injury Fund Board, 594 So.2d 1028, 1035 (La.App. 3 Cir.1992); Jones v. LeDay, 373 So.2d 787, 789 (La.App. 3 Cir.1979).
In the instant case, as evidence of third party fault, Entergy proffered excerpts from the deposition testimony of three individuals: Harry Jackson, the maintenance supervisor at the Feliciana Apartments; Andrew Lawyer, the plaintiff's expert in electrical accident reconstruction; and Jason Rodriguez, Foley's co-worker. Although Entergy maintains that these deposition excerpts represent only a "summary" of the evidence it would have offered had it been allowed to pursue the issue of third party fault at trial, there is no indication from the record, nor does Entergy point to any, that the district court limited the content or form of its proffer in any manner.[13] Rather, it appears that Entergy made a deliberate decision with respect to the content of its proffer. Although it now complains that it could have produced additional evidence material to the issue of third party fault, it fails to describe the substance of any evidence that it could or would have offered.[14]
*165 As we stated in McLean v. Hunter, 495 So.2d 1298, 1305 (La.1986), "[t]he very purpose of requiring a proffer is to preserve excluded testimony so that the testimony (whatever its nature) is available for appellate review." In this case, Entergy submitted its proffer. The court of appeal, after reviewing that proffer and the entirety of the record in this case, determined that the record with the proffer was sufficiently complete to allow it to render a judgment on the issue of third party fault without the necessity of a remand for additional evidence. Under the particular circumstances of this case, and mindful of our repeated admonition that the remand procedure must be "sparingly exercised," we cannot conclude that the court of appeal abused its discretion in this regard. See Nichols v. State Farm Fire & Casualty Company, 06-1017, 1-2 (La.7/10/06), 933 So.2d 786, 787, citing Bayou Rapides Lumber Co. v. Campbell, 215 La. 849, 41 So.2d 781 (1949). Entergy's complaint that the court of appeal erred in not remanding this case to the district court for the receipt of additional evidence and in rendering judgment as to the fault of Latter & Blum and WFMFT on the basis of the record before it is without merit.
Allocation of Fault
In rendering its decision in this matter, the court of appeal affirmed the district court's finding of liability on the part of Entergy, but concluded that the court was "clearly wrong" in its apportionment of fault between the respective negligent actors. Foley, 04-1967 at 6, 925 So.2d at 642. Finding no error in the district court's allocation of 40% of the fault for this accident to Foley's employer, Robertson Roofing, and 5% of the fault to Foley's co-worker, Rodriguez, the court of appeal nevertheless concluded that the district court erred in assigning percentages of fault to Entergy and Foley. The appellate court increased the fault of Entergy from 35% to 50% and reduced the fault of Foley from 20% to 5%. Id., at 7, 925 So.2d 638. Arguing in the alternative, Entergy contends that court of appeal erred in reversing the district court's apportionment of fault as to Foley and the defendant utility company.
In Duncan v. Kansas City Southern Railway Co., XXXX-XXXX (La.10/30/00), 773 So.2d 670, we summarized the standard for reviewing allocation of fault determinations as follows:
This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded "the trier of fact is owed some deference in allocating fault" since the finding of percentages of fault is also a factual determination. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607, 609, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest *166 point respectively which is reasonably within the trial court's discretion. Clement, 666 So.2d at 611; Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1977).
The appellate courts [sic] determination of whether the trial court was clearly wrong in its allocation of fault is guided by the factors set forth in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985). In Watson, we said "various factors may influence the degree of fault assigned, including:
(1) [W]hether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

Watson, 469 So.2d at 974. These same factors guide the appellate court's determination as to the highest or lowest percentage of fault that could reasonably be assessed. Clement, 666 So.2d at 611.
Duncan, 00-0066 at 10-11; 773 So.2d at 680-681.
Cognizant of Clement's admonition that allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the fact finder within that range cannot be "clearly wrong," Riley v. Reliance Insurance Company, 97-0445, pp. 6-7 (La.App. 4 Cir. 11/19/97), 703 So.2d 158, 163, we turn to an examination of the district court's judgment and the allocation of fault therein.
In this case, in addition to assessing Entergy with responsibility for Foley's injuries, the district court also determined that Robertson Roofing, Jason Rodriguez, and Foley were guilty of negligence and that each bear some degree of responsibility for the harm sustained by Foley. With respect to Robertson Roofing, the district court ruled that the employer breached its duty to train Foley and Rodriguez properly and to provide these individuals with a safe work environment. The court determined that under the facts and circumstances of this case, an allocation of 40% of the fault to this negligent actor is appropriate. The record fully supports this factual determination by the district court.
The testimony at trial reveals that Robertson Roofing failed to train and supervise Foley and Rodriguez in conformity with several regulations of the Occupational Safety and Health Administration ("OSHA"). For example, while OSHA regulations prohibit the use of ladders with conductive side rails in the vicinity of overhead power lines, Robertson Roofing furnished Foley and Rodriguez with an aluminum ladder, the only ladder the men had to perform their work. At the time of the accident, Robertson Roofing did not own or use fiberglass ladders because they were believed to be extremely heavy and difficult to position. While OSHA regulations prohibit persons not qualified to work on power lines from working within ten feet of a power line, Robertson Roofing failed to advise its employees of the ten-foot rule. In fact, while Robertson Roofing did have written rules and policies warning its employees not to place or use ladders in the vicinity of power lines, it did not strictly enforce its rules, instead instructing employees to be aware of the *167 danger and use good judgment. While OSHA regulations require that the power company be notified if work is being performed within ten feet of a power line so that the power company can take appropriate measures, such as de-energizing the line, Robertson Roofing failed to request that Entergy de-energize the lines at the apartment complex where its employees were working.[15] Finally, while OSHA regulations require an employer to conduct a pre-job safety analysis to ascertain whether there are hazards on the work site that might cause electric shock injuries and warn employees of the hazards, if they exist, Robertson Roofing failed to conduct a pre-job safety analysis at this site.
Considering the foregoing, it is apparent that the district court had a reasonable factual basis in the record for attributing a large percentage of fault to Foley's employer, who was aware of the risks to which its employees were exposed in being required to work in the vicinity of overhead power lines and, nevertheless, failed to adequately equip and instruct its employees in accordance with applicable OSHA regulations and insure that they were provided a safe work environment.
As to Jason Rodriguez, the district court found that this co-worker/assistant to Foley was also at fault for causing or contributing to the accident, and the record fully supports this factual determination. Rodriguez testified that he was aware of the danger of overhead power lines and the risks attendant on raising an aluminum ladder in the vicinity of such lines. He also testified that he was aware of the presence of the overhead power lines at the apartment complex. Nevertheless, he proceeded to assist Foley in raising the aluminum ladder. Based on this testimony, the district court had a reasonable factual basis for concluding that Rodriguez was guilty of fault that contributed to the accident. The court apportioned 5% of the fault for the accident to Rodriguez, who was clearly the least culpable of the negligent actors in this case, since he was working under the supervision of Foley and had little control over the work environment or his duties with respect thereto.
As to Foley, the district court determined that this unfortunate young man was not entirely free from fault in this incident, and that he should bear some responsibility for raising an aluminum ladder in the vicinity of overhead power lines. Once again, the record in this case fully supports the trial court's determination in this regard.
The evidence establishes that when Foley commenced his employment with Robertson Roofing, the company's human resources manager recited to Foley the contents of a "Safety Checklist," which included the admonition: "Do not place or use any ladders near electrical lines." Foley acknowledged being advised of the rule by signing the bottom of the checklist. He also received a more detailed packet of materials that included the same admonition. The ladder that Foley was using the day of the accident bore a label warning users of the danger of using aluminum ladders in the vicinity of overhead power lines. Rodriguez testified that he and Foley were aware of the presence of the overhead lines at the Feliciana *168 Apartments and even discussed whether the lines in front of Building A were of a sufficient height to allow them to raise the ladder. However, as they were able to raise the ladder at that location, they believed they would also clear the lines at Building D. Rodriguez further testified that as he and Foley raised the ladder in front of Building D, the two men were looking at each other. As the top of the ladder neared the overhead power line, Foley became distracted and abruptly looked down, rubbing his eye as if something had become lodged in it. At that moment, the ladder contacted the power line.
Considering the foregoing testimony, the district court found that the evidence supports a finding of fault on the part of Foley. This finding is not clearly wrong. As we pointed out in Dobson, supra, a reasonable person who has an ordinary amount of exposure to the facts of modern life in America should be treated as though he knows that any electrical line could be dangerous. Dobson, 567 So.2d at 573, citing Cates v. Beauregard Electric Cooperative, 328 So.2d 367 (La. 1976). Any reasonably prudent person who engages in an occupation which requires that he work close to electric lines is under an obligation to acquire the knowledge and ability required to identify uninsulated power lines and to take precautions against the extreme dangers they pose. Dobson, 567 So.2d at 574. Applying these principles to the present case, it is clear that Foley was required to recognize that his conduct near the uninsulated power line created a risk of physical harm to himself, and his failure to take precautions to avoid the risk of which he should have been aware amounted to negligence.
Recognizing this obligation on the part of Foley to safeguard his own well-being, the court, nevertheless, found that the totality of facts and circumstances in this case, including the lack of uniformity in Entergy's lines, the minimal cost to Entergy of correcting that defect, the fact that Foley and Rodriguez had safely raised their ladder 60 to 70 times at other buildings in the complex, the human factors considerations that may have prevented Foley from fully appreciating the danger at this location, and the fact that Entergy had knowledge of the risk but failed to take corrective action, prevented the court from assigning to Foley a greater percentage of fault than 20%.
Turning to consider the fault of Entergy, the district court reasoned that the previous accident to the Davis brothers at the same location in this apartment complex put Entergy on notice that its power lines in front of Building D posed a dangerous condition and a foreseeable risk of a repeat incident that could have been averted at minimal cost to Entergy. The district court found that rather than exercise "utmost care," Entergy exercised minimal care and created a great risk to Foley. The court assessed Entergy with 35% of the fault for Foley's injury.
Our review of the evidence and of the detailed conclusions of the district court in light of the Watson factors convinces us that the district court's allocation of fault between the respective negligent actors was within its vast discretion and not clearly wrong. The evidence amply supports the district court's assessment that, with the exception of Rodriguez, the conduct of each of the negligent actors contributed significantly to the accident, and that Entergy as owner of the power line, and Robertson Roofing, as employer of the roofers, bear the greater percentage of fault. The court of appeal erred in failing to accord proper deference to the vast discretion of the trier of fact in allocating fault and in substituting its judgment as to *169 allocation of fault for that of the trier of fact. This portion of its judgment must be reversed.

CONCLUSION
For the reasons expressed above, we affirm the conclusion of the court of appeal insofar as it assesses Entergy with at least partial responsibility for the damages incurred by the plaintiffs and assigns no fault to either WFMFT or Latter & Blum. However, we reverse the judgment of the court of appeal insofar as it amends the district court's judgment with respect to allocation of fault. That portion of the district court judgment allocating thirty-five percent of the fault for this accident to Entergy and twenty percent to Jeremy Foley is reinstated.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
VICTORY, Justice, dissents and assigns reasons.
TRAYLOR, Justice, dissents and assigns reasons and additionally concurs.
VICTORY, J., dissenting.
I dissent from the majority opinion to the extent it apportions any fault for this accident to Entergy. I particularly disagree with the majority's imposition of liability upon Entergy based on the injury to the Davis brothers nearly 12 years earlier, at the same spot in front of Building D, on the same electrical wire. In Davis v. Louisiana Power & Light Co., 612 So.2d 235 (La.App. 4 Cir.1992), writ denied, 615 So.2d 336 (La.1993), the court of appeal held that: (1) the line in question met all applicable clearance requirements; (2) it was not foreseeable that a professional workman would negligently place his conductive ladder into the power line: and (3) the line in question was not unreasonably dangerous at the time of the Davis accident and that the power company was not negligent in maintaining that line. The same safety standards apply today, specifically the 15 foot vertical clearance requirement, and, once again, those safety standards were met or exceeded. For the majority to hold that Entergy was negligent in this case in not modifying the line after the Davis accident is inconsistent, unreasonable and unjust. Why would Entergy modify the power line after the Davis accident, when the court had found that the line met all applicable safety standards and was not unreasonably dangerous?
Instead of allowing Entergy to rely on the court's earlier finding in Davis that the power line at issue was not unreasonably dangerous, the majority now uses the Davis accident to claim that it was foreseeable that a professional workman would negligently place his conductive ladder into the power line. In so doing, the majority emphasizes that "[f]or the average citizen there is no way of knowing whether the wire is harmless or lethal until it is too late to do anything about it." Op. at ___ (citing Dobson v. Louisiana Power and Light Company, 567 So.2d 569, 572 n. 1). However, in this case, the majority fails to acknowledge that on the day of the accident, immediately prior to raising the ladder at Building D, Jeremy Foley and Jason Rodriguez, the two injured roofers, specifically discussed this power line and whether their ladder might make contact with it, but, unfortunately, simply assumed the ladder would clear the line. Further, Jason Rodriguez admitted that he and Foley could have placed the ladder on another side of the building where there were no power lines. These were not two unknowing "average citizens," but were professional roofers who were well aware that power lines are dangerous, even if almost 19 feet off the ground.
*170 For the above reasons, I respectfully dissent.
TRAYLOR, Justice, concurs in part and dissents in part.
I dissent from the majority opinion insofar as the opinion affirms a finding of liability on the part of Entergy. As a basis for the imposition of fault on the part of Entergy, the majority opinion relies, in part, on Davis v. Louisiana Power & Light Co., 612 So.2d 235 (La.App. 4 Cir. 1992), writ denied, 615 So.2d 336 (La. 1993). However, in Davis, the power company was exonerated from any liability for an injury at the same spot in front of Building D, on the same electrical wire, under almost the same circumstances (a painter raised an aluminum ladder into contact with the power line). The Davis case cannot be used as justification, in any way, for a finding of liability on the part of Entergy in the present matter.
More importantly, the factual circumstances of this case negate any imposition of fault for the accident on the power company. On the day of the accident, Jason Rodriguez and Jeremy Foley, two experienced roofers, who had raised and lowered ladders with the same procedure on 60-70 previous occasions at similar roofing jobs without incident, discussed the power line and the possible danger if their ladder came into contact with the power line. These roofers knew about the possible danger of the power line, discussed the possibility of contact between their ladder and the power line, and made the decision that they should proceed with lifting their ladder in the vicinity of the power line without ascertaining that their ladder would safely clear the distance. Tragically, Foley became distracted as the top of the ladder neared the overhead transmission line and looked down. In the face of the known danger and the men's considered decision to proceed, Entergy bears no responsibility for this accident. These experienced roofers were negligent, not Entergy, when their ladder came into contact with the power line. Thus, I would not find Entergy at fault for the injuries which resulted from this accident.
NOTES
[1] The amount of damages awarded has never been contested on appeal and, thus, is not before us.
[2] The ladder was raised in its unextended state.
[3] The use of the terms "shielded" configuration and "unshielded" configuration, when referring to the position of the neutral and live phase wires, is admittedly confusing. In the electric power transmission industry, the "shielded" configuration typically refers to the situation in which the neutral, shield wire is placed above the live or energized phase wire in order to protect or "shield" the live wire from lightning strikes and a possible disruption of service. The "unshielded" configuration, by contrast, is one in which the live phase wire is placed above the neutral, shield wire, thus, leaving the live wire "unshielded" from possible lightning strikes. The "unshielded" configuration, with the neutral wire below the live phase wire, provides an added margin of safety to those below the wires because one would contact the neutral shield wire before contacting the dangerous energized wire.
[4] While it is true that LSA-R.S. 13:4231(3) adopts issue preclusion in Louisiana, its application is strictly limited to narrowly defined circumstances. Louisiana Revised Statutes 13:4231(3) prevents relitigation of the same issue between the same parties when the issue was actually litigated and its determination was essential to the first judgment. In this case, there is no identity of parties; therefore, issue preclusion cannot apply to bar relitigation or re-examination of any issues determined in the Davis case. See, Turner v. Busby, 03-3444 (La.9/9/04), 883 So.2d 412, 416 (Issue preclusion is not applicable where the parties to the actions are not the same.).
[5] The testimony establishes that the power lines that run in front of Building A of the Feliciana Apartments are strung at a height just above the edge of the roof. The same lines that run in front of Building C are strung at a height just below the overhang of the roof; while the line in front of Building D is strung at a height just a few feet above the base of the third floor balcony.
[6] The NESC defines spaces accessible to pedestrians only as areas where vehicular traffic is not normally encountered or not reasonably anticipated.
[7] For this fact, Lawyer relied on the testimony of Harry Jackson, the maintenance supervisor at the Feliciana Apartments, who stated that it was common for tenants moving into apartments to back U-Haul trucks onto the grass, below the wires, to facilitate their move.
[8] Rule 285(A) of the 1981 edition of the NESC provides, in pertinent part:

All conductors of electric-supply and communication lines should, as far as is practical, be arranged to occupy uniform positions throughout, or shall be constructed, located, marked, numbered, or attached to distinctive insulators or crossarms, so as to facilitate identification by employees authorized to work thereon.
[9] In this case, the fateful contact with the wire in front of Building D did not occur at the line's lowest mid-point, but at a different location on the line, 18.83 feet above the ground.
[10] Lawyer's testimony in this regard was supported by the testimony of Andrew LeCocq, an expert in human factors.
[11] And, in fact, there had been a prior accident at this location under similar circumstances: the accident involving the Davis brothers.
[12] In this regard, we find the facts of this case to be distinguishable from those presented in Davis and in Washington v. Louisiana Power and Light Company, 555 So.2d 1350 (La. 1990), two cases cited by Entergy to support their argument that the location of the power lines did not present an unreasonable risk of harm. In the first place, the fact that the Davis accident occurred at virtually the same location under virtually the same circumstances makes the possibility of another accident at this site even greater. Second, the plaintiffs in both Davis and Washington were found to have full knowledge of the danger involved in their conduct, yet failed to appreciate the danger due to momentary inadvertence. In this case, while Rodriguez acknowledged that he and Foley were aware of the presence of the overhead lines and of the dangers associated with working in proximity to power lines, the fact that Rodriguez and Foley had successfully raised the ladder at least 60-70 times, and that they had been working under the same lines at adjacent buildings that same day without incident, lured them into a false sense of security with respect to the lines in front of Building D, making this case distinguishable from Davis and Washington.
[13] As a result, the instant case is distinguishable from those cases in which, pursuant to the authority granted under LSA-C.C.P. art. 1636, the district court limits the proffer to a "statement setting forth the nature of the evidence," rather than allowing the party to make a record of the excluded evidence. In such instances, upon finding the excluded evidence admissible, the appellate court may remand to permit the introduction of the excluded evidence. Pennison v. Pennison, 542 So.2d 666, 670 (La.App. 5 Cir.1989).
[14] In fact, it appears from a review of the record that Entergy introduced, by way of its proffer, all of the evidence it wished to offer. In colloquy with the district court, counsel for Entergy explained that it did not have "an interest in shooting at Latter & Blum, per se, or WMFMT," but that it intended to "talk about people, like maintenance people at the Feliciana Apartment Complex who know about this and possibly may have had some obligation, as I think one of their own experts talked about, to, you know, alert the plaintiffs to the presence of that power line having some knowledge of the prior accident." This is precisely the evidence Entergy proffered through the excerpts taken from the depositions of Harry Jackson, the maintenance supervisor at the Feliciana Apartments, and Andrew Lawyer, the plaintiff's expert.
[15] In the roofing company's defense, its owner, Girard Robertson, testified that strict adherence to such a rule is impractical and unworkable. Typically the roofing company works on six to seven jobs per day, all in the vicinity of energized lines. The company simply cannot ask Entergy to de-energize every line, and it would not stay in business if forced to advise customers that their power would be turned off while the job was completed.