*1072
 
 MICHAEL E. KIRBY, Judge.
 

 _JjThe defendants, the State of Louisiana through the Louisiana State University Health Sciences Center (LSUHSC), Michael C. Townsend, M.D., and Robert M. Morrison, III, M.D.
 
 [1]
 
 , appeal a district court judgment in favor of the plaintiffs, the Estate of Charles Ratliff, Jr., Katrina M. Thompson, and Charles D. Banks. In conjunction with this appeal, the defendants again raise peremptory exceptions of prescription and no right of action, which the trial court previously overruled. For the reasons that follow, we amend, in part, and reverse, in part, the trial court’s judgment and deny the defendants’ peremptory exceptions.
 

 FACTS AND PROCEEDINGS BELOW
 

 On April 27, 2003, Charles Ratliff, Jr., was admitted to the Medical Center of Louisiana at New Orleans (Charity Hospital) with complaints of nausea, vomiting, abdominal pain and rectal bleeding. He was diagnosed with acute |2cholecystitis
 
 [2]
 
 and cholangitis
 
 [3]
 
 . Mr. Ratliff underwent a laparoscopic cholecystectomy
 
 [4]
 
 performed by Dr. Morrison under the supervision of Dr. Townsend. During the procedure, while Dr. Townsend was absent from the operating room, Dr. Morrison observed a large, inflamed mass that appeared to be emanating from the liver. Due to scar tissue and thickened peritoneum, Dr. Morrison decided to convert the procedure to an open cholecystectomy, which Dr. Townsend approved. During the open procedure, Dr. Morrison severed what he believed to be a cystic duct and dissected the inflamed mass. Dr. Townsend, who was summoned back to the operating room, discovered that Dr. Morrison had severed a ureter
 
 [5]
 
 and removed the right kidney, not the gall bladder. Dr. Townsend and a staff urologist confirmed that the right kidney could not be saved. The surgeons then removed Mr. Ratliffs gall bladder.
 

 Pursuant to LSA-R.S. 40:1299.39.1 A(l)(b), Mr. Ratliff timely filed a request for a state medical review panel, alleging medical malpractice claims against Dr. Morrison, Dr. Townsend, and the LSUHSC. After convening to review the evidence, the medical review panel rendered an opinion, finding that Dr. Morrison and Dr. Townsend had breached the applicable standard by mistaking the kidney for the gallbladder, causing the unnecessary loss of Mr. Ratliffs right Rkidney. Shortly thereafter, Mr. Ratliff filed a petition for damages in the district court asserting claims of medical malpractice against the defendants.
 

 Mr. Ratliff died on May 15, 2007, at the age of 51. The autopsy report listed the manner of death as “Natural” and the cause of death as “Hypertensive atheros-clerotic cardiovascular disease,” or coro
 
 *1073
 
 nary artery disease.
 
 [6]
 
 The report indicated he had a 70-80% blockage of the left anterior descending coronary artery and an enlarged heart.
 

 On October 19, 2007, Ms. Thompson filed a Petition for Independent Administration of the Estate of Charles Ratliff, Jr., in the district court, alleging that she and Mr. Banks were the surviving children and sole legal heirs of the decedent.
 
 [7]
 
 That same day, the trial court appointed Ms. Thompson as the administratrix of the succession.
 

 On November 20, 2007, Ms. Thompson, individually and as administratrix of the succession, and Mr. Banks filed a supplemental and amended petition in the medical malpractice suit asserting survival actions under La. Civ.Code art. 2815.1 and wrongful death claims under La. Civ.Code art. 2315.2. The defendants filed peremptory exceptions of no right of action and prescription or, alternatively, a dilatory exception of lack of procedural capacity, arguing that the plaintiffs were not the legal heirs of the decedent because their respective birth certificates did not name him as their father and they had not filiated with him prior to their 19th |4birthdays
 
 [8]
 
 as required under former La. Civ.Code art. 209
 
 [9]
 
 . The trial court overruled the exceptions and allowed the plaintiffs to file their petition for filiation on June 25, 2008.
 

 The filiation, wrongful death and survival actions were consolidated and tried to a jury over a three-day period. The jury found that Dr. Morrison and Dr. Townsend had breached the applicable standard of care and that their breach had caused and contributed to Mr. Ratliff’s injuries and/or death. The jury also found that Ms. Thompson and Mr. Banks proved by clear and convincing evidence that they were the children of Mr. Ratliff. The jury allocated fault seventy percent (70%) to Dr. Morrison; twenty percent (20%) to Dr. Townsend; and five percent | s(5%) to Mr. Ratliff. As to damages, the jury found the
 
 *1074
 
 following amounts would fairly compensate the plaintiffs:
 

 The Estate of Charles Ratliff, Jr.
 

 Physical pain and suffering. $125,000.00
 

 Mental pain and suffering.$125,000.00
 

 Disability.$125,000.00
 

 Loss of Enjoyment of Life.$125,000.00
 

 Total.$500,000.00
 

 Katrina M. Thompson, Individually
 

 For the wrongful death of her father Charles Ratliff, Jr... .$40,000.00
 

 Charles D. Banks, Individually
 

 For the wrongful death of his father Charles Ratliff, Jr... .$20,000.00.
 

 On August 5, 2008, the trial court rendered a written judgment against LSUHSC in accord with the jury’s verdict.
 

 The defendants appealed the trial court judgment.
 

 ISSUES
 

 On appeal, the defendants raise six assignments of error:
 

 1. The trial court erred by denying the exceptions of prescription and allowing the plaintiffs to file their petition to filiate;
 

 2. The trial court erred in granting the plaintiffs’ motion in limine, precluding the defendants from introducing evidence of Mr. Ratliffs dishonorable discharge from the military;
 

 3. The jury erred by allocating only five (5%) of fault to Mr. Ratliff;
 

 4. The jury award is excessive considering the evidence that Mr. Ratliff failed to mitigate his damages;
 

 |fi5. The jury erred in awarding dupli-cative damages; and 6. The jury erred in finding that the defendants’ negligence caused Mr. Rat-liffs death.
 

 Our consideration of the peremptory exceptions and the issues follows.
 

 STANDARD OF REVIEW
 

 It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong.
 
 Foley v. Entergy La. Inc.,
 
 2006-0983, p. 10 (La.11/29/06); 946 So.2d 144, 153. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one.
 
 Id.
 
 If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
 
 Id.
 
 at p. 10, 946 So.2d at 153. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
 
 Id.
 
 Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the appellate court may well find manifest error.
 
 Id.
 

 DISCUSSION
 

 Peremptory exceptions of no right of action and prescription and Assignment of Error No. 1
 

 _JjThe defendants argue that the plaintiffs’ right of action to filiate was per-empted under La. Civ.Code. art. 197
 
 [10]
 
 or,
 
 *1075
 
 alternatively, their claims as legal heirs were prescribed because they had not fili-ated with Mr. Ratliff prior to their 19th birthdays as required under former La. Civ.Code art. 209 C.
 

 In support of their argument, the defendants cite
 
 Succession of James,
 
 2007-2509, p. 1 (La.App. 1 Cir. 8/21/08), 994 So.2d 120. In that case, the decedent’s alleged daughter petitioned to intervene into his succession proceeding and establish filiation with the decedent years after her 19th birthday but following the enactment of La. Civ. Code art. 197.
 
 Id.,
 
 p. 2, 994 So.2d at 121-122. The administrator of the estate excepted on the grounds that the right to filiate was perempted under former La. Civ.Code art. 209 C and that the new act (La. Civ.Code art. 197) could not revive a prescribed cause of action or create a new one.
 
 Id.
 
 The trial court maintained the exception. Affirming the trial court, the First Circuit Court of Appeal held that the alleged daughter’s petition to intervene into the succession proceeding was barred since she had failed to establish paternity prior to her 19th birthday and that despite the fact that the alleged father had died after the enactment of La. Civ.Code art. 197, the article did not apply retroactively to revive her right, claim or cause of action to filiate.
 
 Id.,
 
 p. 9, 994 So.2d at 125-126.
 

 | ^Conversely, Ms. Thompson and Mr. Banks contend that former La. Civ.Code art. 209 C, which was in effect when they reached nineteen years of age in 1991 and 1992, respectively, provided an exception that allowed a child, who was over the age of nineteen at the time of the alleged parent’s death, to bring a filiation action for the purpose of establishing the right to recover damages under La. Civ.Code art. 2315 within one year of the death of the alleged parent, and allowed the proceeding for that purpose to be cumulated with the action to recover damages. Thus, the plaintiffs contend that they did not have to establish filiation with the decedent prior to their 19th birthdays to assert wrongful death and survival action claims as a result of his death. They also point out that the one year peremptive period set forth in La. Civ.Code art. 197 applies only to succession proceedings, See La. Civ.Code art. 197,
 
 Revision Comments (e),
 
 and, thus, their claims under La. Civ.Code arts. 2315.1 and 2315.2, which were asserted in their supplemental and amended petition and filed within a year Mr. Ratliff’s death, are neither perempted nor prescribed.
 

 The function of the exception of no right of action is to determine whether the plaintiff belongs to a class of persons to whom the law grants the cause of action asserted in the suit. La.Code Civ. Proc. art. 927;
 
 Badeaux v. Southwest Computer Bureau, Inc.,
 
 2005-0612, p. 6 (La.3/17/06), 929 So.2d 1211, 1217 (citation omitted). “The exception of no right of action assumes that the petition states a valid cause of action for some person and questions whether the plaintiff in the particular case is a member of the class that has a legal interest in the subject matter of the litigation.”
 
 Industrial Companies, Inc. v. Durbin,
 
 2002-0665, p. 12 (La. 1/28/03), 837 So.2d 1207, 1216. Evidence is admissible on the trial of an exception of no right of action to “support or controvert the objections pleaded, |9when the grounds therefore do not appear from the petition.”
 
 Id., citing
 
 La.Code Civ. Proc. art. 931.
 

 In
 
 Reese v. State of Louisiana, Dept. of Public Safety and Corrections,
 
 2003-1615, p. 5 (La.2/20/04), 866 So.2d 244, 248, the
 
 *1076
 
 Louisiana Supreme Court recognized that the purpose of the exception provided for in La. Civ.Code art. 209 C was “to allow the child who was over the age of nineteen at the time of the alleged parent’s death to bring a filiation action, but only for the purposes of establishing the right to recover survival or wrongful death damages and not for any other purpose such as recovering succession rights.”
 

 In
 
 Reese,
 
 the plaintiff, an illegitimate adult child of the decedent, timely filed a petition for wrongful death and survival damages as a result of his alleged father’s death. The defendants filed a peremptory exception of no right of action claiming that the plaintiff had no right of action to institute the suit because he was not a legitimate child of the decedent and had not timely filed a filiation action in accordance with La. Civ.Code art. 209. Meanwhile, nearly two years after the decedent’s death, the plaintiff filed a supplemental and amended petition to establish filiation. The trial court sustained the exception of no right of action, finding the plaintiff had not timely filiated with the decedent. The First Circuit Court of Appeal affirmed.
 
 [11]
 

 On the application of the plaintiff, the Supreme Court granted certiorari
 
 [12]
 
 and reversed the lower courts. The Court considered whether the timely-filed survival and wrongful death actions by the adult illegitimate child interrupted prescription for the filing of the cumulated filiation action. The Court found the 110timely-filed original petition, while not artfully drafted (it merely alleged the plaintiff was a surviving child of the decedent), gave fair notice to the defendants of the plaintiffs attempts to set forth a cause of action for filiation, and thus, the plaintiffs supplemental and amending petition, which clarified the facts regarding filiation, related back to the original petition as it arose out of the same factual situation set forth in the original petition and, thus, the trial court erred sustaining the defendant’s exception of no right of action and dismissing the plaintiffs wrongful death and survival actions.
 
 Id.,
 
 at p. 10, 866 So.2d at 251.
 

 In the instant case, the plaintiffs filed their supplemental and amended petition within one year of Mr. Ratliffs death, asserting their status as his children seeking survival and wrongful death damages. Under former La. Civ.Code. art. 209 C and La. Civ.Code arts. 2315.1 and 2315.2, those claims were timely. Their petition for fili-ation, however, was filed more than a year after the death. Nonetheless, the facts alleged therein, if proven by clear and convincing evidence, would establish paternity. Several exhibits are attached to the petition for filiation. Exhibit A is a copy of a notarized Act of Procuration, dated September 22, 2003, executed by Mr. Ratliff in favor of Ms. Thompson, wherein he declares that she is his daughter. Exhibit B is a transcript Mr. Ratliffs sworn testimony, given at a November 17, 2006 deposition, wherein he identified Ms. Thompson as his daughter and Mr. Banks as his son.
 

 The petition for filiation clearly related back to the supplemental and amended petition as it arose out of the same factual situation set forth therein. Considering the holding in
 
 Reese, supra,
 
 we find the plaintiffs’ timely filed supplemental and amended petition in the medical malpractice suit interrupted prescription for the filing of their cumulated filiation action and that their right of Inaction for wrongful death and survival damages resulting from
 
 *1077
 
 Mr. Ratliffs death is neither prescribed nor perempted. Thus, the defendants’ peremptory exceptions are denied.
 

 The defendants did not challenge the jury’s finding of paternity in an assignment of error. Generally, an appellate court will review only issues which were submitted to the trial court and are contained in assignments of error. See Uniform Rules of Louisiana Courts of Appeal—Rule 1-3. We note, however, that the trial court erred, as a matter of law, by allowing the jury to consider the issue of filiation. La.Code Civ. Proc. art. 1732(3)
 
 [13]
 
 expressly prohibits a jury trial in a filiation proceeding. Although Mr. Ratliff is not named as the father on the plaintiffs’ respective birth certificates, his sworn deposition testimony and the exhibits submitted with the petition for filiation clearly establish that he is their father. Thus, the jury’s finding that the plaintiffs proved paternity by clear and convincing evidence will not be disturbed.
 

 Assignment of Error No. 2
 

 In the second assignment of error, the defendants argue that the trial court erred in granting the plaintiffs’ motion in limine, excluding any evidence of Mr. Rat-liffs dishonorable discharge and incarceration at the United States Disciplinary Barracks at Fort Leavenworth, Kansas. Because the trial court allowed the plaintiffs to introduce evidence of Mr. Ratliffs military service and refer to him as
 
 \wa
 
 veteran during the trial, the defendants contend evidence of his dishonorable discharge was admissible for impeachment purposes. Specifically, the defendants emphasize that several plaintiff witnesses testified that Mr. Ratliff visited his children while on leave and sent letters to them while on duty, when, in fact, he was incarcerated. The defendants argue that allowing the plaintiffs to portray Mr. Ratliff as an honorable, military veteran tainted the fact finding process, and, thus, a
 
 de novo
 
 review of the record is warranted, citing
 
 Evans v. Lungrin,
 
 97-0541 (La.2/6/98), 708 So.2d 731, 735.
 

 A trial court has great discretion in the admissibility of evidence and its decision to admit or exclude evidence may not be reversed on appeal absent a clear abuse of that discretion.
 
 Lauve v. Lauve,
 
 2008-0076, pp. 7-8 (La.App. 4 Cir. 8/20/08), 6 So.3d 184, 189;
 
 writ denied,
 
 2009-0557 (La.5/1/09), 6 So.3d 812;
 
 reconsideration not considered,
 
 2009-0557 (La.6/5/09), 9 So.3d 863. On appeal, the court must consider whether the complained-of ruling was erroneous and, if so, whether the error affected a substantial right of the complaining party. La. C.E. art. 103 A.
 

 Prior to trial, the parties agreed to stipulate that Mr. Ratliff voluntarily entered the military on September 25, 1972, and was discharged on May 30, 1975. The plaintiffs filed a motion in limine to exclude any evidence regarding the circumstances of Mr. Ratliffs discharge. Over the defendants’ objection, the trial court granted the motion. On direct examination, plaintiffs’ counsel questioned several witnesses regarding Mr. Ratliffs reasons for enlisting in the military and his relationship with his children during his period of service. On cross examination, defense counsel attempted, over the plaintiffs’ objection, to impeach the testimony of these same witnesses by offering evidence to show that Mr. |1sRatliff was not in the
 
 *1078
 
 army but rather incarcerated. The trial court sustained the objection but allowed the defense to proffer Mr. Ratliffs military discharge records and his unredacted deposition testimony.
 
 [14]
 

 Considering the fact that Mr. Ratliff served in the army for a very brief period more than thirty years before the act of medical malpractice at issue and that evidence of his military conviction was not admissible under La. C.E. art. 609(B)
 
 [15]
 
 , we cannot say the trial court abused its discretion by excluding evidence of the dishonorable discharge. Also, given the testimony of Ms. Thompson and Mr. Banks, who testified they had little or no knowledge of Mr. Ratliffs military service, and that of their mothers, Cynthia Sanders and Gloria Banks Jones, who testified that he had no significant role in the children’s lives during their childhoods, we do not find the defendants’ right to impeach those witnesses was adversely affected.
 

 Assignment of Error No. 3
 

 In their third assignment of error, the defendants argue that the jury erred in allocating only five percent
 
 (5%)
 
 of fault to Mr. Ratliff. To the contrary, the defendants argue that Mr. Ratliff, by his destructive actions and poor lifestyle choices prior tó and after the loss of his kidney, was more than five percent (5%) at fault in causing his injuries and eventual death. We agree.
 

 114A determination of the allocation of fault by the trier of fact is a factual finding subject to the manifest error of review.
 
 Foley, supra,
 
 at p. 10, 946 So.2d at 153.
 

 In determining percentages of fault, the trial court must consider the nature of the conduct of all parties and the extent of the causal relationship between the conduct and the damages claimed.
 
 Watson v. State Farm Fire and Casualty Insurance Co.,
 
 469 So.2d 967, 974 (La. 1985). In assessing the nature of the conduct of the parties, various factors may influence the degree of fault, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor to proceed in haste, without proper thought.
 
 Clement v. Frey,
 
 95-1119, p. 8 (La.1/16/96), 666 So.2d 607, 611. If the appellate court finds a “clearly wrong” apportionment of fault, it should adjust the allocation, but only to the extent of lowering or raising it to the highest or lowest point, respectively, which is reasonably within the trial court’s discretion.
 
 Id.
 

 The evidence in the record discloses that after returning from Fort Leavenworth, Mr. Ratliff worked odd jobs until he obtained a commercial driver’s license. He then became a cement and dump truck driver. 1989, he was diagnosed with encephalitis (inflammation of the brain), which caused permanent brain damage, leaving him physically and mentally disabled.
 
 [16]
 
 Medical records from Charity Hospital indicate that prior to contracting
 
 *1079
 
 encephalitis, Mr. Ratliff was in relatively good health but had a history of hypertension (high blood pressure), |1salcohol and intravenous (IV) drug use, and smoking cigarettes and marijuana, sometimes laced with formaldehyde. The hospital discharge summary indicated the final diagnosis as “Aseptic Meningitis,” meaning no viral, bacterial or fungal agents were found. According to the undisputed testimony of Dr. Donald Gervais, defendants’ expert neurologist, in the absence of a viral or bacterial origin, a chemical agent such as drugs could have caused the encephalitis.
 

 Between 1985 and 2003, when Mr. Ratliff entered Charity Hospital for gall bladder surgery, he was treated for uncontrolled hypertension with several prescribed medications, including Clonidine. He acknowledged at his deposition that during those years he often failed to take his medications, smoked marijuana and cigarettes daily, and consumed alcohol. Mr. Ratliff remained in the hospital for several days following the removal of his kidney and gallbladder.
 

 Shortly thereafter, Mr. Ratliff saw Dr. Joshua Lowentritt, a nephrologist who treated him for more than a year. During that time, Dr. Lowentritt prescribed Ena-lapril, an ace inhibitor designed to protect kidney function and lower blood pressure in patients with hypertension. Dr. Lowen-tritt testified that Mr. Ratliff had a history of pre-existing heart disease and uncontrolled hypertension, meaning he was not taking medication as prescribed. As to the remaining kidney, he explained that Mr. Ratliff had Stage 3 kidney disease, with Stage 5 being the worst and requiring a transplant for survival. Dr. Lowentritt opined that Stage 3 kidney disease could be managed well with medication and a proper diet. He testified that Mr. Ratliff did not need dialysis or a kidney transplant, and, even if he did, he would not have been a candidate for a transplant because of his history of alcohol and IV drug use. Regarding Mr. Ratliffs recreational use of marijuana, Dr. 11RLowentritt said it did not pose a significant medical problem in terms of kidney function.
 

 According to Dr. Lowentritt, in an ideal case, an otherwise healthy patient’s remaining kidney could last two to three decades without dialysis or the need for a transplant. But in a case like Mr. Ratliff, who had pre-existing health problems and often forgot to take his medicine, the remaining kidney could last eight to fifteen years, at most, before needing dialysis or a transplant. In any event, Dr. Lowentritt opined that the loss of the kidney in Mr. Ratliff, who had pre-existing uncontrolled hypertension, significantly increased the risk of greater hypertension and problems associated with it, including atherosclerosis. Nonetheless, on cross-examination regarding the autopsy report, he acknowledged that Mr. Ratliffs atherosclerosis likely developed over a period of ten or more years and that Mr. Ratliff had several of the risk factors for the disease.
 

 In May 2004 and August 2005, Mr. Ratliff was admitted to the hospital with a diagnosis of “Acute Renal Failure” due to dehydration. Dr. Lowentritt explained that dehydration was not uncommon in kidney patients on ace inhibitors and generally was treated with aggressive rehyd-ration and an adjustment in medication, which were done in Mr. Ratliffs case. The May 2004 hospitalization toxicology urine report indicated Mr. Ratliff tested positive for marijuana use and a physician’s notation read, “patient decided his blood pressure medication had too many side effects so he used marijuana instead.” Medical records from the August 2005 hospitalization indicated Mr. Ratliff was also suffering from “toxic delirium (altered
 
 *1080
 
 mental state) secondary to substance abuse.”
 

 Due to Hurricane Katrina in late August 2005, Mr. Ratliff relocated to Maryland. He lived for several months with Ms. Thompson, her husband and their |17two sons before getting his own apartment. While in Maryland, he was seen by several doctors including, including Dr. Arnulfo Bonavente, a family practice physician, and Drs. Ravinder Sindhwani and Dr. Atul Kayal, both nephrologists. In April 2006, Mr. Ratliff was admitted to Southern Maryland Hospital Center (“SMHC”) after he was found unresponsive on the floor of his apartment. He remained in the hospital for five days. The SMHC discharge summary listed the following diagnoses: “Acute encephalopathy, likely from illicit drug abuse including eannabinoids and alcohol abuse.” An addendum to the discharge summary stated: “Concerning [Mr. Ratliffs] illicit drug use, the patient has been counseled to stop taking eannabinoids and abusing alcohol. The patient at this time says that he is going to stop on his own.” The medical records also disclosed that, on the recommendation of his physician, SMHC had arranged for Mr. Ratliff to receive weekly skilled nursing care at home from Adventis Home Health, but after two visits, he refused the care.
 

 Mr. Ratliff was admitted to SMHC again in August 2006, after he broke his right leg during a fight over money from a marijuana purchase. In addition to the leg injury, the physicians noted “hypertension and dehydration due to renal insufficiency.” Upon discharge, Mr. Ratliff spent five weeks at Future Care Pineview Rehabilitation Center, where he received physical therapy and skilled nursing care. When he returned to his apartment, he continued to receive therapy through Ad-ventis Home Health for several weeks. Mr. Ratliff died in Maryland in May 2007.
 

 Dr. Gregory Sloop, the plaintiffs’ expert in anatomical clinical pathology, testified that the loss of the kidney resulted in an exacerbation of Mr. Ratliffs uncontrolled hypertension, which contributed to the atherosclerosis in his heart and 118led to his death. When asked whether the loss of the kidney contributed to Mr. Ratliffs death, Dr. Sloop responded, “[undoubtedly.” He also denied that Mr. Ratliffs drug and alcohol use contributed to his failure to comply with his physicians’ instructions.
 

 On the other hand, the defendants’ expert, Dr. April Fox, a nephrologist and internal medicine specialist, testified that loss of Mr. Ratliffs kidney did not cause his death. She emphasized that at the time of his death, his left kidney was still functioning. Based upon her review of Mr. Ratliffs medical records pre and postne-phrectomy, she found no evidence of a significant increase in Mr. Ratliffs hypertension. She explained that but for the two episodes of acute renal failure, which were caused by dehydration and easily treated, Mr. Ratliffs creatinine
 
 [17]
 
 levels remained stable between 1.6 and 1.8, indicating the disease had not progressed.
 

 The plaintiffs also offered the testimony of Dr. Roberta Bell, an expert neuropsy-chologist who examined Mr. Ratliff in July 2005. She described Mr. Ratliff as being confused and depressed. Noting his cognitive disability, Dr. Bell testified that Mr.
 
 *1081
 
 Ratliff was below average intellectually and had difficulty expressing himself. She opined that given Mr. Ratliffs preexisting mental and physical impairments, the loss of his kidney created an extremely complex medical situation, which, if not properly addressed, would lead to more problems. On cross examination, Dr. Bell admitted that Mr. Ratliff overestimated or distorted his actual level of psychopathology, meaning “he appeared to feel that he was even [l9worse off and functioning worse off than he really was.” She explained that Mr. Ratliff did not think much of his ability to cope with life.
 

 The defendants do not dispute that Dr. Morrison and Dr. Townsend were at fault in causing damages to Mr. Ratliff. However, given, that Mr. Ratliff’s cause of death was coronary artery disease, which gradually occurred over his lifetime, and in light of his destructive lifestyle, they contend that it was unreasonable and erroneous for the jury to allocate only five percent (5%) of fault to him. The plaintiffs counter that Mr. Ratliffs pre-existing mental and physical impairments severely limited his ability to care for himself and that because the tortfeasor takes the victim as he finds him, his fault is minimal.
 

 The documentary medical records clearly negate Dr. Sloop’s and Dr. Lowentritt’s testimony that Mr. Ratliff’s drug and alcohol use had no significant effect on his injuries and death. After losing his kidney, Mr. Ratliff was hospitalized several times. Each time, either substance abuse or failure to take medication was a factor. Also, even despite Mr. Ratliff’s physical and mental limitations, the evidence indicates that he was very independent, capable of living alone and caring for himself with little or no assistance. He chose not to take prescribed medication, but instead to consume alcohol, smoke marijuana and cigarettes, against the physicians’ warnings. Mr. Ratliff also refused home health care.
 

 As to atherosclerosis, the documented cause of death, both the plaintiff and defense witnesses agreed that it was a progressive disease that occurred over a period of several years. It was undisputed that Mr. Ratliff was at high risk for the disease given his uncontrolled hypertension and history of heavy smoking.
 

 RnAlso, we note that Mr. Ratliff’s left kidney was still functioning at the time of his death, and even though Dr. Morrison and Dr. Townsend were at fault for the loss of the right kidney, Mr. Ratliff never needed dialysis or a kidney transplant as a result of their malpractice.
 

 Considering the overwhelming medical evidence, we find the Mr. Ratliff’s long-term use of illegal drugs, cigarettes and alcohol and his failure to take prescribed medication and comply with physicians’ orders, significantly contributed to his injuries and eventual death. Thus, we conclude the jury clearly erred in allocating only five percent (5%) of fault to Mr. Ratliff. Therefore we will raise the percentage of fault attributable to Mr. Ratliff to lowest amount that was reasonably within the jury’s discretion. We find that amount to be twenty-five (25%), and will amend the trial court judgment accordingly.
 

 Assignments of Error Nos. 4 and 5.
 

 Collectively, the fourth and fifth assignments of error address the issue of excessive damages. The defendants argue the damage award is duplicative because it awards Mr. Ratliffs estate $125,000.00 for each of the following categories; physical pain and suffering; mental pain and suffering; and, loss of enjoyment of life. They further argue there was no evidence offered to support the disability award. The
 
 *1082
 
 defendants contend, too, that Mr. Ratliff failed to mitigate his damages.
 

 General damages are those which may not be fixed with any degree of pecuniary exactitude, but which involve mental or physical pain or suffering, inconvenience, the loss of gratification or intellectual or physical enjoyment, or other losses of life or lifestyle, which cannot really be measured definitively in |21 terms of money.
 
 McGee v. A C and S, Inc.,
 
 2005-1036, pp. 3-4 (La.7/10/06), 933 So.2d 770, 774 (citations omitted). The Supreme Court explained the distinction between damages for loss of life and other elements of general damages as follows:
 

 Moss of enjoyment of life is conceptually distinct from other components of general damages, including pain and suffering. Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. Loss of enjoyment of life, in comparison, refers to detrimental alterations of the person’s life or lifestyle or the person’s inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury. In contrast to pain and suffering, whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury.
 

 Id.,
 
 at pp. 5-6, 933 So.2d at 775. Vast discretion is accorded the trier of fact in fixing general damage awards. La. Civ. Code art. 2324.1;
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257, 1260-61 (La.1993), ce
 
 rt. denied,
 
 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
 

 Regarding the amount damages awarded for the elements of physical pain and suffering as well as mental pain and suffering, we do not find the jury abused its discretion. Although, Mr. Ratliff experienced pain and suffering due to the Cho-lecystectomy, the evidence showed the needless nephrectomy caused additional trauma to his body, requiring him to endure substantially higher pain and a longer recovery period. Also, Mr. Ratliff was significantly more depressed knowing he had only one remaining kidney and could die if it failed. Thus, we decline to disturb the trial court’s award of $125,000.00 for physical pain and suffering, and $125,000.00 for emotional pain and suffering.
 

 Nonetheless, we find the jury clearly abused its discretion in awarding Mr. Ratliffs estate damages for loss of enjoyment of life and, thus, reverse, the award. |22The plaintiffs offered no evidence that Mr. Ratliffs lifestyle was negatively affected as a result of the loss of his right kidney. He continued to do the same activities that he did prior to the nephrectomy.
 

 Likewise, we find the jury abused its discretion is awarding disability damages and, thus, reverse the award. There is no evidence that Mr. Ratliff sustained any further disability as a result of the loss of his right kidney. The evidence showed Mr. Ratliff had not worked and had been receiving social security disability benefits for his permanent disability for many years prior to the loss of his kidney.
 

 Last, the defendants argue that the award should be reduced because Mr. Ratliff failed to mitigate his damages, emphasizing, again, that his bad habits and destructive lifestyle contributed to his injuries and death. Because we considered these factors in increasing the percentage of fault attributable to Mr. Ratliff, and amend the trial court judgment accordingly, we decline to further disturb the damage award on this ground.
 

 
 *1083
 

 Assignment of Error No. 6.
 

 The defendants concede that Dr. Morrison’s and Dr. Townsend’s negligence caused the loss of Mr. Ratliffs kidney. However, in the sixth assignment of error, they contend that the loss of the kidney did not cause Mr. Ratliffs death but reduced his chances of survival instead. Thus, the defendants argue the damage award should be adjusted to reflect a loss chance of survival.
 

 Considering the testimony of the expert witnesses, the jury apparently agreed with Dr. Lowentritt and Dr. Sloop, concluding that the loss of Mr. Ratliffs kidney aggravated his pre-existing hypertension, which compounded his ^atherosclerosis and contributed to his eventual death. Keeping in mind the appellate standard of review, we will not disturb the jury’s finding in this regard.
 

 DECREE
 

 In summary, we deny the peremptory exceptions of prescription and no right of action. Furthermore, we find the trial court erred in allocating only five percent (5%) of fault to Mr. Ratliff and in awarding the Estate of Mr. Ratliff damages for loss of enjoyment of life and disability.
 

 Accordingly, we amend the judgment of the trial court, in part, to allocate fault as follows: fifty percent (50%) to Dr. Morrison; twenty-five percent (25%) to Dr. Townsend; and, twenty-five percent (25%) to Mr. Ratliff. We reverse the judgment, in part, insofar as it awarded damages for loss of enjoyment of life and disability. In all other respects the judgment is affirmed.
 

 AFFIRMED IN PART, AMENDED IN PART AND REVERSED IN PART.
 

 [1]
 

 . Dr. Townsend was surgeon and teaching physician on staff at Tulane University Medial Center (TUMC). Dr. Morrison was a fifth year surgical resident at TUMC. LSUHSC owned and operated the Medical Center of Louisiana at New Orleans (Charity Hospital), a public health care facility that served as a teaching/training hospital for both LSUHSC and TUMC.
 

 [2]
 

 . Cholecystitis is inflammation of the gallbladder, a complication of gallstones which are formed by cholesterol and pigment (biliru-bin) in bile.
 

 [3]
 

 . Cholangitis is a chronic disorder of the liver in which the ducts carrying bile from the liver to the intestine, and often the ducts carrying bile within the liver, become inflamed, thickened, scarred (sclerotic), and obstructed.
 

 [4]
 

 . Cholecystectomy is the surgical removal of the gallbladder. The procedure may be done by laparoscopy or by open surgery.
 

 [5]
 

 . Ureter is either of the long, narrow tubes carrying urine down from the pelvis of each kidney to the urinary bladder.
 

 [6]
 

 . Atherosclerosis is a process of progressive thickening and hardening of the walls of medium sized and large arteries as a result of fat deposits on their inner lining. Risk factors for atherosclerosis include high levels of “bad” cholesterol, hypertension (high blood pressure), smoking, diabetes and a genetic family history atherosclerotic disease.
 

 [7]
 

 .
 
 Succession of Charles Ratliff, Jr.,
 
 Civil District Court No: 07-13988, Div. I, Section 14.
 

 [8]
 

 . Ms. Thompson was born on November 28, 1972, and Mr. Banks was born on February 9, 1973.
 

 [9]
 

 .
 
 La. Civ.Code art. 209, repealed by Acts 2005, No. 192, effective June 29, 2005, had provided:
 

 A.A child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgment under Article 203 must prove filiation as to an alleged living parent by a preponderance of the evidence in a civil proceeding instituted by the child or on his behalf within the time limit provided in this article.
 

 B. A child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgment under Article 203 must prove filiation as to an alleged deceased parent by clear and convincing evidence in a civil proceeding instituted by the child or on his behalf within the time limit provided in this article.
 

 C. The proceeding required by this article must be brought within one year of the death of the alleged parent or within nineteen years of the child's birth, whichever first occurs. This time limitation shall run against all persons including minors and interdicts. If the proceeding is not timely instituted, the child may not thereafter establish his filiation, except for the sole purpose of establishing the right to recover damages under Article 2315. A proceeding for that purpose may be brought within one year of the death of the alleged parent and may be cumulated with the action to recover damages.
 

 D. The right to bring this proceeding is heritable.
 

 [10]
 

 . Acts 2005, No. 192, § 1, eff. June 29, 2005, repealed former La. Civ.Code art. 209 and enacted current La. Civ.Code art. 197, which provides:
 

 A child may institute an action to prove paternity even though he is presumed to be the child of another man. If the action is instituted after the death of the alleged fa
 
 *1075
 
 ther, a child shall prove paternity by clear and convincing evidence.
 

 For purposes of succession only, this action is subject to a peremptive period of one year. This peremptive period commences to run from the day of the death of the alleged father.
 

 [11]
 

 . See
 
 Reese v. State of Louisiana, Dept. of Pub. Safety & Corr.,
 
 2002-1429 (La.App. 1 Cir. 5/9/03), 845 So.2d 620.
 

 [12]
 

 . See
 
 Reese v. State of Louisiana, Dept. of Pub. Safety & Corr.,
 
 2003-1615 (La.10/17/03), 855 So.2d 744.
 

 [13]
 

 . La.Code Civ. Proc. art. 1732, provides:
 

 A trial by jury shall not be available in:
 

 [[Image here]]
 

 (3) A summary, executory, probate, partition, mandamus, habeas corpus, quo war-ranto, injunction, concursus, workers’ compensation, emancipation, tutorship, interdiction, curatorship, filiation, annulment of marriage, or divorce proceeding.
 

 [14]
 

 . The proffered evidenced indicates that Mr. Ratliff was dishonorably discharged after being convicted by a military tribunal for killing another serviceman during a fight. He was sentenced to 15 years at Fort Leavenworth but served only six.
 

 [15]
 

 . La. C.E. art. 609(B) provides:
 

 Evidence of a conviction under this Article [ (Attacking credibility by evidence of conviction of crime in civil cases) ] is not admissible if a period of more than ten years has elapsed since the date of the conviction.
 

 [16]
 

 .The physical impairments included an unsteady gait and a decrease in fine motor dexterity. The mental impairments included memory loss and cognitive deficits.
 

 [17]
 

 . Creatinine is a chemical waste molecule that is generated from muscle metabolism. Creatinine is transported through the blood stream to the kidneys, which filter and dispose of it in the urine. Although it is a waste, Creatinine serves as a diagnostic function and indicator of kidney disease. In an adult male, normal levels of Creatinine are approximately 0.6 to 1.2 milligrams per deciliter (mg/dl). A person with only one kidney may have a normal level of about 1.8 or 1.9mg/dl. As Creati-nine levels rise, the chance of needing dialysis increases.